
[No. G032995. Fourth Dist., Div. Three. July 27, 2005.]

RICHARD B. LEVINE, INC., Plaintiff and Appellant, v.
GERALD HIGASHI et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION†]**

---

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for
publication with the exception of parts I and IV of the Discussion.

**COUNSEL**

Law Offices of Mary A. Lehman and Mary A. Lehman for Plaintiff and Appellant.

Garrett & Tully, Efren A. Compean and Christopher G. Piety for Defendants and Respondents.

**OPINION**

**IKOLA, J.**—Richard B. LeVine, Inc. (plaintiff), appeals from a summary judgment and also challenges the court's earlier rulings on demurrer. We conclude an arbitration award in favor of defendants' alleged coconspirators bars any claim grounded on an aiding and abetting or conspiracy theory, and plaintiff failed to establish any independent duty owed by defendants to plaintiff. Accordingly, in the published portion of this opinion, we affirm the summary judgment. In the unpublished portions of this opinion, we discuss an evidentiary ruling and also affirm the earlier rulings on demurrer.

## FACTS

Plaintiff was a partner in a medical partnership named Orange County Heart Institute and Research Center (OCHI) formed in 1994. Cardiologist Richard B. LeVine was plaintiff's officer, employee, and sole shareholder.

Gerald Higashi and HMWC CPAs & Business Advisors (collectively Higashi) were retained to provide accounting services to OCHI, including the calculation of each partner's share of the partnership profits and the amount of each partner's capital account. Higashi's calculation of each partner's share of the 1994 profits was completed without controversy in accordance with the provisions of article 7 of the OCHI partnership agreement. Thereafter, Dr. LeVine died in June 1995, and his wife Roberta LeVine became plaintiff's sole shareholder and president.

After Dr. LeVine's death, OCHI's chief executive officer informed Higashi that the OCHI partners had agreed to change the method of allocating the partners' income and had decided to allocate $239,501 to plaintiff for 1995. Higashi followed these instructions and directed one of his firm's bookkeepers to prepare a worksheet reflecting the new allocation. Before Higashi prepared plaintiff's 1995 Schedule K-1, he wrote OCHI a letter confirming the latter's instructions regarding the calculation of profits. The confirming letter was countersigned by OCHI's chief executive officer on March 8, 1996. Accordingly, plaintiff's 1995 Schedule K-1, prepared by Higashi, reflected a profit allocation of $239,501. In February 1996, OCHI paid plaintiff $81,611 to buy out plaintiff's partnership interest. The payment was accepted under protest, and plaintiff's accountant wrote a letter claiming additional amounts were owed under the partnership agreement.

In October 1996, OCHI advised Higashi that plaintiff's partnership interest had been bought out and that plaintiff was no longer a partner, its voting powers and interest in the profits having terminated upon Dr. LeVine's death on June 15, 1995. Higashi received further instructions from OCHI in February 1997 to prepare the 1996 partnership tax return and the partners' K-1 statements to reflect the redemption of plaintiff's partnership interest with a resultant zero balance in its capital account.

Meanwhile, Mrs. LeVine had attempted to obtain financial information about the OCHI partnership, apparently without success. In October 1995, she sought the assistance of Stephen Bennett, a certified public accountant who had provided services for plaintiff since the 1980's, to obtain the partnership financial information. Beginning in February 1996, Bennett demanded further payments for plaintiff's partnership interest in OCHI, including the disputed 1995 profits.

Plaintiff also retained a law firm to pursue its claims, and, in 1998, initiated an arbitration proceeding against OCHI and its partners pursuant to an arbitration provision in the partnership agreement. In a two-phase arbitration proceeding, the arbitrator ruled in phase one that under the partnership agreement plaintiff was not entitled to partnership profits accruing after Dr. LeVine's death, and in phase two that plaintiff was not entitled to additional profits for 1995. The final arbitration award was made on September 7, 2000.

On November 7, 2001, plaintiff filed the instant action against Higashi. The demurrer war began. Ultimately, plaintiff's third amended complaint alleged constructive and actual fraud, negligence, and conspiracy. The court sustained

Higashi's demurrer to the constructive and actual fraud causes of action. Later, the court granted Higashi's summary judgment motion as to the remaining causes of action. On this appeal, plaintiff challenges the court's rulings on both the demurrer and the summary judgment motion.

## DISCUSSION

### I

*The Evidentiary Ruling at the Summary Judgment Hearing*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### II

*The Court Correctly Adjudicated the Conspiracy and Aiding and Abetting Claim*

After a seemingly endless round of demurrers, the only matters at issue at the time of defendants' summary judgment motion were two causes of action contained in plaintiff's fourth amended complaint labeled "Civil Conspiracy (Aiding and Abetting)" and "Professional Negligence." We conclude the court correctly granted Higashi's motion as to each cause of action.

■ The standard for deciding a summary judgment motion is well-established, as is the standard of review on appeal. "[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. . . . There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fns. omitted [107 Cal.Rptr.2d 841, 24 P.3d 493].) "We review the trial court's decision de novo, considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116].)

### A. *The Arbitration Adjudicated the Same Cause of Action Raised in the Conspiracy and Aiding and Abetting Claim*

The stated basis for the court's ruling granting the motion with respect to the civil conspiracy claim was threefold: (1) Plaintiff's evidence was "not

---

[*]See footnote, *ante*, page 566.

only inconclusive," it was "actually unintelligible"; (2) the conspiracy claim was barred by the statutes of limitation applicable to the underlying torts of breach of fiduciary duty and conversion; and (3) the awards in the arbitration proceeding between plaintiff, OCHI, and its partners collaterally estopped plaintiff from proceeding on the conspiracy claim. We conclude the third reason, which the court called collateral estoppel, but we will call res judicata or claim preclusion, conclusively established Higashi's complete defense to the claim for civil conspiracy.[4]

■ " 'Res judicata' describes the preclusive effect of a final judgment on the merits. Res judicata, or claim preclusion, prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them. Collateral estoppel, or issue preclusion, 'precludes relitigation of issues argued and decided in prior proceedings.' [Citation.] Under the doctrine of res judicata, if a plaintiff prevails in an action, the cause is merged into the judgment and may not be asserted in a subsequent lawsuit; a judgment for the defendant serves as a bar to further litigation of the same cause of action." (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896–897, fn. omitted [123 Cal.Rptr.2d 432, 51 P.3d 297].) Although the trial court invoked the narrower prong of the doctrine, collateral estoppel, under the circumstances of this case we think it is more accurate to invoke the strict res judicata, or claim preclusion, aspect of the doctrine. Whatever name one attaches to the legal principle, the result is the same. Regardless of what term we use, the question we address is whether, under the facts of this case, plaintiff is precluded from pursuing this particular claim against Higashi.

It is unclear from plaintiff's operative fourth amended complaint whether it was relying on a conspiracy theory or an aiding and abetting theory. But it doesn't matter. Under either legal avenue, summary judgment was properly granted because Higashi's liability is dependent upon the commission of an underlying tort by OCHI and its partners, a claim decided adversely to plaintiff in the prior arbitration.

---

[4] We choose not to rest our decision on the statute of limitations defense. The problem here is that the court overruled plaintiff's demurrer to the statute of limitations defense pleaded in Higashi's answer to the operative fourth amended complaint. The answer had alleged plaintiff's claims are "barred by the applicable statute of limitations set forth in California Code of Civil Procedure Sections 337, 338, and 339, and any other applicable statute of limitations, including but not limited to, those arising under the Internal Revenue Code and/or other tax authorities." Section 458 of the Code of Civil Procedure requires the statute of limitations to be pleaded either by alleging the facts constituting the time bar or alleging the statute and the *subdivision* of the statute which bars the action. Higashi did not plead the applicable subdivision of the relevant statutes. Thus, the court erred in overruling the demurrer to the answer. According to long-standing case law, the failure to allege the appropriate subdivision of the statute of limitations waives the defense. (*Davenport v. Stratton* (1944) 24 Cal.2d 232, 246–247 [149 P.2d 4].)

We begin by recognizing the well-worn principle applicable to the civil conspiracy theory: "[T]here is *no separate tort* of civil conspiracy, and there is *no civil action* for conspiracy to commit a recognized tort unless the *wrongful act* itself is committed and damage results therefrom." (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 44, p. 107; see *Unruh v. Truck Insurance Exchange* (1972) 7 Cal.3d 616, 631 [102 Cal.Rptr. 815, 498 P.2d 1063] ["A civil conspiracy however atrocious, does not per se give rise to a cause of action unless a civil wrong has been committed resulting in damage"].) "[T]he only significance of the conspiracy charge is that each member may be held responsible as a joint tortfeasor, regardless of whether or not he directly participated in the act." (5 Witkin, *supra*, Torts, § 44, p. 107.) Thus, under the civil conspiracy claim, we will consider whether Higashi can be held liable for the acts of the alleged coconspirators, the OCHI partners. Whether Higashi can be liable for his direct acts will be considered on our review of the professional negligence claim.

Closely related to plaintiff's conspiracy theory is its aiding and abetting theory. " 'Liability may . . . be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person.' " (*Fiol v. Doellstedt* (1996) 50 Cal.App.4th 1318, 1325–1326 [58 Cal.Rptr.2d 308].)

The unifying principle under either theory of recovery, civil conspiracy or aiding and abetting, is that Higashi's liability depends upon the actual commission of a tort. Here, the underlying tort is the alleged breach of fiduciary duty committed by plaintiff's OCHI partners. As plainly alleged in plaintiff's fourth amended complaint, "Plaintiff's Partners . . . violat[ed] . . . their fiduciary duties to Plaintiff, to cause Plaintiff's share of Profits to be withheld and allocated to one or more of Plaintiff's Partners from 1995 until June 1999." Plaintiff further alleged, "As a result of Plaintiff's Partners' breach of their fiduciary duties to Plaintiff, Plaintiff did not receive its proper allocation of Partnership Profits from 1995 until June 1999 . . . . [¶] [and] Plaintiff did not receive it[s] appropriate portion of distributions or capital withdrawals that Plaintiff's Partners made to themselves from 1995 until June 1999 . . . ." Plaintiff's pleading went on to allege Higashi "substantially assisted Plaintiff's Partners in this scheme" when he "was required to engage in fraudulent accounting practices to withhold a portion of Plaintiff's share of the Partnership Profits for the year 1995 and to allocate such Profits to Plaintiff's Partners contrary to the provision of the Partnership Agreement" and to make "certain improper and fraudulent accounting entries to Plaintiff's Capital Account, eliminating Plaintiff's capital and its interest in future Profits, and made those entries retroactive to January 1, 1996."

Unless plaintiff's partners in OCHI committed the underlying tort alleged here, i.e., breach of fiduciary duty, Higashi cannot be held liable either as a conspirator or as an aider and abettor. An arbitrator determined in September 1998, after a four-day hearing, that plaintiff "is not entitled to share in the profits of [OCHI] accruing after the death of Dr. LeVine." Moreover, although the arbitrator found the OCHI partners had breached the partnership agreement by not buying out plaintiff's interest "forthwith," but instead had unreasonably delayed the purchase, the arbitrator expressly ruled: "The evidence does not establish a breach of fiduciary duty by [the OCHI partners] or conduct otherwise entitling [plaintiff] to punitive damages." Finally, the arbitrator found the OCHI partners "did not convert [plaintiff's] partnership interest." On September 7, 2000, after the phase two arbitration proceeding had concluded, the arbitrator found plaintiff had been paid all amounts to which it was entitled from the 1995 partnership profits, and made no further monetary award based on the alleged diversion of profits.

■ The question which remains, of course, is whether the findings of the arbitrator must be given preclusive effect in the instant action brought against Higashi and his firm, who calculated the numbers used in making the profit distributions. We hold the arbitrator's award in favor of the OCHI partners on plaintiff's claims of breach of fiduciary duty and conversion precludes the claims of civil conspiracy and aiding and abetting made against Higashi in this action. Thus summary judgment was properly granted on those theories.

■ We find support in the primary right theory utilized in California to determine whether causes of action are identical. "California follows the primary right theory of Pomeroy; i.e., a cause of action consists of 1) a primary right possessed by the plaintiff, 2) a corresponding primary duty devolving upon the defendant, and 3) a delict or wrong done by the defendant which consists in a breach of such primary right and duty. [Citation.] Thus, *two actions constitute a single cause of action if they both affect the same primary right.*" (*Gamble v. General Foods Corp.* (1991) 229 Cal.App.3d 893, 898 [280 Cal.Rptr. 457], italics added; see *Acuña v. Regents of University of California* (1997) 56 Cal.App.4th 639, 648 [65 Cal.Rptr.2d 388].) Even when several defendants cause a single injury to plaintiff, "[t]he primary right is determinative. So, if there is only one primary right violated there is only one cause of action, even though there may be two or more wrongdoers, each doing a wrongful act and each individually liable for it." (4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 55, p. 111.)

The primary right asserted in the arbitration against the OCHI partners was the right to be free of the wrongful diversion of plaintiff's rightful share of partnership profits to other OCHI partners. The instant conspiracy and aiding and abetting claim against defendants asserts the identical primary right. Thus

plaintiff's claim against the OCHI partners is identical to its claim against defendants. Of course, liability for invasion of that primary right must be established against each party charged with the invasion. But if plaintiff's primary right is not violated at all, no defendant is liable.

B. *Res Judicata Applies to an Arbitration Award That Eliminates the Basis for a Nonarbitrating Party's Derivative Liability*

Plaintiff contends res judicata cannot be based on the arbitration award against it because Higashi was not a party to the arbitration. Plaintiff relies on *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815 [88 Cal.Rptr.2d 366, 982 P.2d 229] (*Vandenberg*), which held that arbitration awards do not support nonmutual collateral estoppel unless there was an agreement to that effect. But *Vandenberg* is not controlling here, because it does not bar application of res judicata to arbitration awards that eliminate the basis for a nonarbitrating party's derivative liability.

We turn to the cases we conclude are determinative. In *Sartor v. Superior Court* (1982) 136 Cal.App.3d 322 [187 Cal.Rptr. 247] (*Sartor*), a homeowner brought an action against a corporation and several of its employees seeking damages for fraud and negligence. The corporation had been retained to provide architectural and engineering services in connection with the building of a house, and the house was allegedly defective. The contract with the corporation contained an arbitration provision, so the trial court stayed the action pending completion of an arbitration between the homeowner and the corporation. The arbitrator ruled the homeowner failed to prove the fraud charge, and the only defect in the house consisted of some " 'defective gaskets in the solar collector.' " (*Sartor, supra,* 136 Cal.App.3d at p. 325.) The homeowner then sought to litigate the action against the individual defendants, the corporation's employees. Relying upon *Bernhard v. Bank of America* (1942) 19 Cal.2d 807 [122 P.2d 892], the *Sartor* court granted summary judgment in favor of the employees, concluding that "the issues decided in the arbitration proceeding with respect to the [fraud and negligence causes of action] were *identical* with the ones sought to be pursued in the action against [the individual defendants]." (*Sartor, supra,* at p. 328, italics added.) The court reasoned the claims were identical because the corporation could act only through its agents. Thus if the corporation was absolved of its derivative liability, the agents were likewise necessarily absolved. (*Ibid.*)

*Thibodeau v. Crum* (1992) 4 Cal.App.4th 749 [6 Cal.Rptr.2d 27] (*Thibodeau*), was another case involving arbitration of a claim for defective construction. Homeowners arbitrated "numerous construction deficiencies with the general contractor on their single-family home." (*Thibodeau, supra,* 4

Cal.App.4th at p. 752.) Among these deficiencies was a complaint about "radiating cracks" in the driveway. (*Id.* at p. 753.) With respect to this deficiency, the arbitrator awarded money to the homeowners for driveway repair, and denied the general contractor's claim for extra work. After the arbitration award was made, the general contractor filed a chapter 11 bankruptcy, and, because of the automatic stay in the bankruptcy petition (see 11 U.S.C. § 362), the award was never confirmed as a judgment. (*Thibodeau* at p. 753.) Thereafter, the driveway cracks worsened, and the homeowners brought suit against the subcontractor who had been hired by the general contractor to construct the driveway. The *Thibodeau* court held the claim against the subcontractor was barred by the preclusive effect of the arbitration award, noting "the two proceedings here involve the same homeowner, the same home, and the same driveway." (*Id.* at p. 757.) The court treated the claim made in the arbitration as being identical to the subsequent claim made in the action against the subcontractor, and the parties did not argue otherwise. That is, if the driveway was negligently constructed, it was done at the hands of the subcontractor hired by the general contractor. Thus the general contractor's liability, if any, was derivative of his subcontractor's liability, and the claims were identical.

*Thibodeau* also addressed another issue having importance to resolution of the instant case. It held the arbitration award against the general contractor precluded relitigation of the identical claim against the subcontractor even though the award was never confirmed as a judgment. (*Thibodeau, supra,* 4 Cal.App.4th at p. 761.)

After *Sartor* and *Thibodeau,* the California Supreme Court decided *Vandenberg, supra,* 21 Cal.4th 815. *Vandenberg* held that "a private arbitration award, even if judicially confirmed, may not have nonmutual collateral estoppel effect under California law unless there was an agreement to that effect in the particular case." (*Id.* at p. 824.) Plaintiff seizes upon the *Vandenberg* holding to argue the private arbitration award made in the proceeding between plaintiff, OCHI, and the OCHI partners does not preclude plaintiff from pursuing its identical claims against Higashi. But *Vandenberg* stated at the outset the rule it announced was narrow, saying: "Our holding is narrowly circumscribed. Nothing in our decision imposes or implies any limitations on the strict res judicata, or 'claim preclusive,' effect of a California law private arbitration award." (*Id.* at p. 824, fn. 2.) The high court cited two examples of the types of cases to which its holding did *not* apply, namely, *Sartor* and *Thibodeau.* The *Vandenberg* court summarized *Thibodeau* as holding an "unconfirmed award in private arbitration between homeowner and general contractor is res judicata barring homeowner's identical claim against subcontractor." (*Ibid.*) The *Vandenberg* court summarized *Sartor* as holding a "confirmed private arbitration award in favor of architectural firm is res judicata barring homeowner's identical causes of action against firm's

employees." (*Ibid.*) The court's characterization of the estoppel in *Thibodeau* and *Sartor* as "strict res judicata" or "claim preclusive," even though the arbitration award and the subsequent lawsuit were against different parties, is based on the derivative nature of the liability. In *Sartor*, the corporation's liability was derivative of its agent's liability, and in *Thibodeau*, the general contractor's liability was derivative of its subcontractor's liability. For that reason, the claims were treated as identical, even though brought against different parties.

The *Vandenberg* court's limitation of its own holding was applied by a different panel of this court in *Brinton v. Bankers Pension Services, Inc.* (1999) 76 Cal.App.4th 550 [90 Cal.Rptr.2d 469] (*Brinton*). In *Brinton*, an investor established a self-directed retirement account with defendant. Defendant used a broker to recommend various investment vehicles for its customers. When plaintiff's investments became worthless, an arbitration proceeding was brought against the broker. The arbitrator denied all of plaintiff's claims. Thereafter, plaintiff instituted an action against defendant. The *Brinton* court applied the *Vandenberg* limitation, and held the arbitration award in favor of the broker precluded the claim against defendant. The same primary right was allegedly invaded by both the broker and defendant. The court concluded: "[S]ince defendant's liability is merely derivative of [the broker's], it is unnecessary for defendant to have been a party to the prior action to assert a claim preclusion defense in this case." (*Id.* at pp. 557–558.)

*Sartor*, *Thibodeau*, and *Brinton*, all held a claim preclusion defense was available where the liability of one of the parties would be derivative only. In *Sartor*, the arbitration award that exonerated the principal for the acts of its employees precluded an action against the employees. In *Thibodeau*, the arbitration award against the general contractor precluded a subsequent action against the subcontractor who had done the work. And in *Brinton*, an arbitration award that exonerated the investment broker precluded an action against the broker's principal.

Plaintiff acknowledges the holdings of *Sartor*, *Thibodeau*, and *Brinton* but characterizes these cases as comprising "an existing narrow body of law holding employees, agents, or subcontractors are essentially the same [as] their employers for res judicata purposes when their liability derives from that of parties in a prior action and the claims against both are identical." Plaintiff argues that such a finding of identity of separate parties is limited to circumstances wherein the liability of one party is established only derivatively because of its relationship to another party, typically an employer and employee. Indeed, the seminal case *Bernhard v. Bank of America, supra*, 19 Cal.2d 807, in the course of establishing its rule of nonmutual collateral estoppel, noted the preexisting rule in "courts of most jurisdictions" that

found mutuality is "not necessary where the liability of the defendant asserting the plea of res judicata is dependent upon or derived from the liability of one who was exonerated in an earlier suit brought by the same plaintiff upon the same facts. [Citations.] Typical examples of such derivative liability are master and servant, principal and agent, and indemnitor and indemnitee." (*Id.* at p. 812.)

But imposition of derivative liability is not limited to the doctrine of respondeat superior. Liability based on an aiding and abetting or conspiracy theory is also "derivative," i.e., liability is imposed on one person for the direct acts of another. "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. [Citation.] By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the *torts of other coconspirators* within the ambit of the conspiracy." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510–511 [28 Cal.Rptr.2d 475, 869 P.2d 454], italics added.) Similarly, aiding and abetting liability may " 'be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the *other's conduct* constitutes a breach of duty and gives substantial assistance or encouragement *to the other* to so act or (b) gives substantial assistance *to the other* in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person.' " (*Fiol v. Doellstedt, supra,* 50 Cal.App.4th at pp. 1325–1326, italics added.)

Thus, we perceive no reason why the "strict res judicata" (*Vandenberg, supra,* 21 Cal.4th at p. 824, fn. 2) claim preclusion rule should not be made available to a defendant such as Higashi, sued on a conspiracy and aiding and abetting theory where plaintiff has already arbitrated or litigated against the direct tortfeasor and lost. Plaintiff has asserted an invasion of its primary right and it has been determined that right was not invaded—the OCHI partners did *not* breach their fiduciary duty, and plaintiff's rightful share of the OCHI profits was *not* diverted. It would be anomalous to hold Higashi liable for conspiring to commit a tort, or for aiding and abetting its commission, where plaintiff has already asserted those rights against the direct tortfeasor, the claim was adjudicated, and it was determined plaintiff's rights were *not* violated. We conclude the claim preclusion aspect of res judicata bars plaintiff's conspiracy and aiding and abetting claim and affirm that part of the judgment.

### III

*The Court Correctly Adjudicated the Professional Negligence Claim*

Plaintiff insists it has established a duty owing to it by Higashi, or at least established a triable issue of fact regarding the existence of a duty, precluding summary judgment on the professional negligence claim. Plaintiff begins its argument with a moment of candor by acknowledging "it is undisputed there was no contract or privity between [Higashi] and [plaintiff]." Nevertheless, plaintiff contends it was either an intended third party beneficiary of the work done under Higashi's contract with OCHI to calculate each partner's individual profits (see *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 343 [134 Cal.Rptr. 375, 556 P.2d 737] (*Goodman*)), or it was owed a noncontractual *implied* duty as Higashi's "client" (see *Johnson v. Superior Court* (1995) 38 Cal.App.4th 463, 474–477 [45 Cal.Rptr.2d 312] (*Johnson*)). Alternatively, plaintiff asserts that Higashi's status as an agent of one or more of the OCHI partners attributed the same fiduciary duty to Higashi as was owed to plaintiff by its partners. Lastly, plaintiff contends certain statutes and regulations that govern accounting practices establish Higashi's duty to plaintiff. We disagree with all of plaintiff's arguments and conclude Higashi did not owe a duty to plaintiff under the undisputed facts.

#### A. *Higashi's Work Was Not Intended to Benefit Plaintiff*

In *Goodman*, the California Supreme Court considered the circumstances under which a lawyer could be held liable in negligence for bad advice given to the lawyer's own client which, when the advice was followed, caused harm to a third party. The *Goodman* court concluded no duty existed under the circumstances of that case based on an analysis and balancing of the various factors mentioned in *Biakanja v. Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16] (*Biakanja*).

Here, of course, the professional defendants are accountants, not lawyers. Significantly, the evidence does not even show that Higashi's professional advice was solicited or given. The undisputed evidence establishes Higashi merely calculated the profit allocations in the manner instructed by OCHI, and confirmed these instructions in writing. Despite the undisputed evidence that Higashi was only following instructions from his acknowledged client, the entity that had retained Higashi, plaintiff nevertheless asserts Higashi owed it an independent noncontractual duty as an intended beneficiary of Higashi's contracted services with OCHI. According to plaintiff, this duty is established by balancing the factors set forth in *Biakanja*.

At the outset, plaintiff's theory is somewhat difficult to understand. According to plaintiff's theory, Higashi's negligence was *not* the failure to perform the actual services requested of him. Instead, he was allegedly negligent for performing the services exactly as instructed by his client. Plaintiff asserts Higashi should have refused to follow OCHI's instructions, or should have advised plaintiff of the instructions he had received. On our de novo review, a balance of the *Biakanja* factors tips the scale sharply in favor of Higashi. As in *Goodman*, we conclude Higashi did not have the duty asserted by plaintiff.

■ The *Biakanja* factors were applied to a negligence claim against accountants in *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370 [11 Cal.Rptr.2d 51, 834 P.2d 745] (*Bily*). Investors in a company sought to hold the company's accountant liable for the negligent preparation of an audit report on the company's financial statements. The Supreme Court conducted an extensive analysis, including the *Biakanja* factors, and concluded "an auditor's liability for general negligence in the conduct of an audit of its client['s] financial statements is confined to the client, i.e., the person who contracts for or engages the audit services. Other persons may not recover on a pure negligence theory." (*Bily, supra*, at p. 406.) In arriving at this conclusion, the court noted: "In applying the *Biakanja* factors [citation], we are necessarily required to make pragmatic assessments of the consequences of recognizing and enforcing particular legal duties." (*Ibid.*) We likewise make a "pragmatic assessment."

The first *Biakanja* factor is the "extent to which the transaction was intended to affect the plaintiff." (*Biakanja, supra*, 49 Cal.2d at p. 650.) In a case wherein a third party alleged attorney malpractice, *Johnson, supra*, 38 Cal.App.4th 463, the court observed "the cases which impose a duty in favor of a third party are those in which the purpose of retention of the attorney was for the specific objective of creating . . . a benefit." (*Id.* at p. 471.) "[A] duty to the third party beneficiary of legal services [is imposed] because that was the intention of the purchaser of the legal services—the party in privity. Thus, imposition of the duty carries out the prime purpose of the contract for services." (*Id.* at p. 472.) Plaintiff characterizes the transaction here at issue as Higashi's retention for "the specific purpose of calculating the individual partners' profits in OCHI." But that characterization of the evidence is incomplete and thus misleading. The transaction which allegedly caused the harm was the retention of Higashi to calculate the profits of each partner *in the manner instructed by the partnership*. OCHI instructed Higashi to make the calculation differently than set forth in the written partnership agreement, with the result, according to plaintiff, that plaintiff was allocated less than it

would have received had Dr. Levine not died and had the strict letter of the written partnership agreement been followed without adjustment or modification. Just as in *Johnson*, and giving credence to plaintiff's theory of damage, OCHI's intention was obviously not to benefit plaintiff "via the advice and services [it] solicited from [defendants]." (*Ibid.*) Accordingly, Higashi's retention to make this calculation as instructed by the partnership cannot be characterized as being done for the specific purpose of creating such a benefit for plaintiff.

The second *Biakanja* factor is the "foreseeability of harm" to plaintiff. (*Biakanja, supra*, 49 Cal.2d at p. 650.) Plaintiff argues "it is foreseeable to the accountant a miscalculation of a partner's share will injure the partner." The obvious flaw in plaintiff's argument is that there is no evidence of a *miscalculation*. Higashi *calculated* the partnership profit allocation precisely as instructed. Moreover, there is *no* evidence that at the time Higashi received instructions regarding the 1995 calendar year he had been given any reason to believe the OCHI partners had not advised plaintiff of the methodology to be used for that year, or, for that matter, that plaintiff had not agreed with the adjustments in the calculation.

The third *Biakanja* factor is "the degree of certainty that the plaintiff suffered injury." (*Biakanja, supra*, 49 Cal.2d at p. 650.) As noted, there is no evidence Higashi knew that the calculation he was instructed to make was not agreed upon by plaintiff or that plaintiff had not been notified of the methodology. As it turned out, of course, the arbitrator ultimately ruled plaintiff suffered no injury whatever.

The other *Biakanja* factors require little discussion. The connection between the conduct and the alleged harm was not close. (*Biakanja, supra*, 49 Cal.2d at p. 650.) OCHI's decision to adjust the method of allocating partnership profits was closely connected to the alleged harm. The connection between Higashi's participation and the alleged harm was remote. Higashi merely did as he was instructed by his client. And finally, moral blame should not attach to following the instructions of a client where there is no evidence to suggest Higashi had reason to suspect the instructions were wrongful or intended to cause harm. And nothing about following a client's instructions violates any policy of preventing future harm. (*Ibid.*) In sum, plaintiff was not owed a duty as an intended beneficiary of the contracted services.

### B. *Plaintiff Was Not Higashi's Client*

Plaintiff argues a triable issue of fact exists as to whether Higashi owed it an implied duty based on Higashi's representation of the partnership. Its argument is based on the discussion in *Johnson, supra*, 38 Cal.App.4th at

pages 474–479, wherein the court identified several nonexhaustive factors to be considered in determining whether a lawyer's representation of a partnership also establishes an attorney-client relationship with the individual partners.

First, we question whether all the factors identified by the *Johnson* court, even if relevant, bear the same weight for determining the existence of an *accountant*-client relationship as they do for determining the existence of a lawyer's duty of care owed to a client, or for identifying a lawyer's disqualifying conflict of interest. The *Johnson* court drew its factors from *Responsible Citizens v. Superior Court* (1993) 16 Cal.App.4th 1717 [20 Cal.Rptr.2d 756], a case involving disqualification of legal counsel, in which the court held "an attorney representing a partnership does not necessarily have an attorney-client relationship with an individual partner for purposes of applying the conflict of interest rules. Whether such a relationship exists turns on finding an agreement, express or implied, that the attorney also represents the partner." (*Id.* at p. 1721.) In the course of identifying the factors to consider, the *Responsible Citizens* court stated: "[T]he rule prohibiting simultaneous representation of adverse interests is said to be an outgrowth of the confidential nature of an attorney-client relationship. Because a client reposes confidence in his or her attorney, the attorney owes the client a duty of undivided loyalty. [Citations.] For that reason, we believe that in determining whether an attorney-client relationship exists in cases like this, primary attention should be given to whether the totality of the circumstances, including the parties' conduct, implies an agreement by the partnership attorney not to accept other representations adverse to the individual partner's personal interests." (*Id.* at p. 1733.)[5]

But even accepting that the finding of an implied agreement not to represent adverse interests is an appropriate factor to determine the existence of an implied accountant-client relationship, the evidence here does not support such a finding. If, as suggested by the *Responsible Citizens* court, the sharing of client confidences with the professional is the source of the duty of loyalty, that source is lacking here. Mrs. LeVine stated in her declaration she did not even know Higashi was keeping the books for the OCHI partnership until November 1999, much less that she or her corporation shared any

---

[5] While we concede a confidential relationship may exist between an accountant and a client, the law gives that relationship less protection than an attorney-client relationship. For example, "[t]he United States Supreme Court [has] recognized the public function of the CPA auditor as a reason to deny work product protection to the auditor's work papers." (*Bily, supra,* 3 Cal.4th 370, 383, citing *United States v. Arthur Young & Co.* (1984) 465 U.S. 805, 817–818 [79 L.Ed.2d 826, 104 S.Ct. 1495]; see also *Couch v. United States* (1973) 409 U.S. 322, 335 [34 L.Ed.2d 548, 93 S.Ct. 611] [no auditor-client privilege]; *Fisher v. United States* (1976) 425 U.S. 391 [48 L.Ed.2d 39, 96 S.Ct. 1569] [no inherent self-incrimination privilege for communications to accountant].)

confidences with Higashi. And even before Higashi calculated the allocation of profits for 1995, plaintiff had retained its own accountant, Stephen Bennett, to assist in obtaining financial information from OCHI. When Bennett contacted Higashi in late 1995 to ask how he could obtain partnership financial information, he was referred to Ilse Loy, an employee of the OCHI partnership. Thereafter, Bennett dealt directly with Loy, not Higashi. It would be anomalous indeed to conclude that plaintiff was *Higashi*'s client under these circumstances.

■ At bottom, the finding of an accountant-client relationship must be founded upon an agreement which, if not expressed, must at least be implied in fact. We do not find any evidence in this case from which it can be implied that Higashi was performing accounting services for plaintiff, as contrasted with the performance of services for the partnership generally. ■ We do not imply a contract between an individual partner and the partnership's accountant from the mere provision of a Schedule K-1 to the individual partner. Providing a Schedule K-1 to individual partners satisfies the *partnership's* obligation under the Internal Revenue Code. (26 U.S.C. § 6031(b) ["Each partnership required to file a return . . . shall . . . furnish to each person who is a partner . . . a copy of such information required to be shown on such return as may be required by regulations"].) Thus, the *partnership* as an entity, rather than an individual partner, appropriately contracts with an accountant to perform this service.

The "totality of the circumstances" here, including the total lack of any reliance by plaintiff on Higashi, weighs conclusively against an implied contract between Higashi and plaintiff. Plaintiff asserts it relied on the Schedule K-1 for 1995 provided by Higashi. Not so. The evidence establishes conclusively that plaintiff at all times *challenged* the accuracy of the profit allocation, and continued to complain about its inability to verify its accuracy because of OCHI's denial of access to the books and records. But that denial of access cannot be attributed to Higashi. That the income reported on Schedule K-1 may well have been reported to the Internal Revenue Service, does not mean plaintiff relied on that document as accurately showing its entitlement to profits. It means only that plaintiff reported that which was acknowledged by the partnership.

Consideration of the other factors identified by the *Johnson* court does not change our conclusion there was no implied contract between plaintiff and Higashi, and thus no implied duty in negligence. One of these factors, the relatively small size of the partnership, may in some circumstances weigh in favor of a separate accountant-client relationship with each partner. But here,

the absence of any contacts between plaintiff and Higashi negates any implication of a separate relationship. And another factor, the accountant's access to financial information relating to the individual partner's interest, doesn't assist either. The only financial information in Higashi's possession was the information necessary to provide accounting services to its client, the OCHI partnership.

The remaining two *Johnson* factors, the nature and scope of the engagement, and the kind and extent of contacts between the accountant and the individual partners, weigh heavily against a separate accountant-client relationship with Higashi. Regarding the nature and scope of Higashi's engagement, it is significant that no evidence suggests Higashi was engaged to determine *how* to allocate profits following the death of Dr. LeVine. On the contrary, Higashi received *those* instructions from OCHI. And there is no evidence that Higashi had reason to believe plaintiff was not a participant in the decision to modify the method of allocation set forth in the written partnership agreement. From Higashi's perspective, the method of allocation was a partnership decision, not Higashi's decision. If the instructions he received in that regard constituted a violation of the partnership agreement, the partnership would need to deal with the problem. Higashi was *not* retained to advise the partnership as to how or in what manner it could modify or adjust the methodology set forth in the written partnership agreement. Put simply, the scope of Higashi's engagement was to count the dollars coming in and going out, to calculate the partnership profits, and to allocate the profits among the partners as instructed, not to launch an independent investigation to determine whether the partnership was or was not acting in compliance with the written partnership agreement.

Finally, as noted *ante*, the complete absence of any contacts between Higashi and plaintiff weighs heavily against the imposition of any duty owing by Higashi to plaintiff. We conclude as a matter of law, based on the evidence in this record, there was no implied accountant-client contract between plaintiff and Higashi for the provision of any accounting services. Thus a duty owing to plaintiff in tort cannot be founded upon the so-called *Johnson* theory.

## C. *Defendant Did Not Owe an "Attributed" Fiduciary Duty*

Plaintiff also contends that Higashi's services to the partnership "attributed" to Higashi the same fiduciary duty owed by the OCHI partners because Higashi was acting as an agent of the partners who themselves were fiduciaries. Plaintiff acknowledges, however, that "[a] professional's representation of a fiduciary does not of itself impose upon that professional a fiduciary obligation to the beneficiary." Plaintiff nevertheless urges that

a fiduciary duty will be attributed to a professional acting as an agent of a fiduciary whenever the professional is engaged to assist the beneficiary and the fiduciary equally, and not as an adversary.

Plaintiff overstates its argument. The creation of a fiduciary obligation or duty must, at a minimum, arise from facts demonstrating the formation of a confidential relationship. None are present here. "A fiduciary relationship is created where a person reposes trust and confidence in another and the person in whom such confidence is reposed obtains control over the other person's affairs." (*Lynch v. Cruttenden & Co.* (1993) 18 Cal.App.4th 802, 809 [22 Cal.Rptr.2d 636].) We decline to "attribute" to Higashi the fiduciary duties owed to plaintiff by the OCHI partners. Higashi did nothing more than make a calculation as instructed. As discussed, *ante*, the undisputed facts in this case demonstrate that an accountant-client relationship was not established between Higashi and plaintiff. Plaintiff shared no confidences with Higashi. And there is no evidence plaintiff ever placed its trust in Higashi. Even if it had, "[t]he mere placing of a trust in another person does not create a fiduciary relationship." (*Zumbrun v. University of Southern California* (1972) 25 Cal.App.3d 1, 13 [101 Cal.Rptr. 499].) "Finally, an agreement to communicate one's knowledge, exercising his special knowledge and skill in the area of learning concerned, does not create a trust but only a contractual obligation." (*Ibid.*) Here, that contractual obligation ran only to the OCHI partnership.

## D. *Statutes and Regulations Did Not Establish a Duty to Plaintiff*

Finally, plaintiff argues that certain statutes and regulations governing accounting practices establish Higashi's duty to plaintiff. Plaintiff asserts that standards adopted by the American Institute of Certified Public Accountants (AICPA) establish that duty. But plaintiff did not produce *any* AICPA standard for our review, and the expert opinion submitted in opposition to the summary judgment motion was similarly unsupported by any such foundation.

Plaintiff also contends that former part 10.29 of title 31 of the Code of Federal Regulations provides the source of a duty. During the years relevant to this case, part 10.29 provided: "No attorney, certified public accountant, enrolled agent, or enrolled actuary shall represent conflicting interests in his practice before the Internal Revenue Service, except by express consent of all directly interested parties after full disclosure has been made." But plaintiff presents no authority or argument to establish that the preparation of an informational partnership tax return with the required K-1 Schedules constitutes "practice before the Internal Revenue Service." The regulation is inapt.

At oral argument, plaintiff asserted that Higashi was required to calculate the profit allocation by strictly following the methodology set forth in the written partnership agreement, despite receiving contrary instructions from the partnership, and, as authority for that proposition, cited section 704 of the Internal Revenue Code. (26 U.S.C. § 704.) Section 704(a) provides: "A partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this chapter, be determined by the partnership agreement." In other words, distributive shares of profit or loss must be reported to the Internal Revenue Service in the manner *agreed* to by the partners, unless the Internal Revenue Code overrides their agreement. But that begs the question. Here, although the *written* partnership agreement provided a method of allocation, the partners *orally* agreed to modify the formula, and gave Higashi a written confirmation that the modification had been made. Although paragraph 15.4 of the written partnership agreement requires amendments to the agreement to be in writing, this type of provision may be waived. (*Biren v. Equality Emergency Medical Group, Inc.* (2002) 102 Cal.App.4th 125, 141 [125 Cal.Rptr.2d 325].) That is what happened here. And third parties, such as the Internal Revenue Service and Higashi, have no responsibility to police the internal governance of the partnership. What matters to third parties is the fact of amendment—not how it was done.

We conclude no duty was owed to plaintiff under the circumstances shown by the evidence. Higashi merely did a calculation in the manner instructed by his client. We decline to place Higashi in the position of policing his own client to ensure strict compliance with the client's own partnership agreement, or to *assume* that instructions received from his own client cannot be relied upon or should not be followed, or, in the absence of any evidence of necessity, should first be discussed individually with each partner. Summary adjudication was correctly granted on the cause of action for professional negligence.

IV

*The Rulings on Demurrer*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante*, page 566.

## DISPOSITION

The judgment is affirmed. Higashi shall recover his costs on appeal.

O'Leary, Acting P. J., and Aronson, J., concurred.

A petition for a rehearing was denied August 22, 2005, and appellant's petition for review by the Supreme Court was denied November 16, 2005.