Filed 9/11/13

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| VENTURA KESTER, LLC, | B241889 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC439607) |
| v. | |
| FOLKSAMERICA REINSURANCE COMPANY, | |
| Defendant and Respondent. | |


APPEAL from a judgment and an order of the Superior Court of Los Angeles County, James R. Dunn, Judge.  Reversed and remanded.

Law Offices of Christian J. Garris and Christian J. Garris for Plaintiff and Appellant.

Sedgwick LLP, Susan Koehler Sullivan, Amand K. Mines and Douglas J. Collodel for Defendant and Respondent.


_____

An owner of commercial property that was vandalized while vacant brought an action against its insurer to recover for lost rent. The parties filed competing motions for summary adjudication as to whether the insurer was liable for rent in the absence of a tenant. The trial court granted summary judgment in favor of the insurer, from which the owner appeals. We hold that under the terms of the policy, recovery for lost rent did not require the owner to have an existing tenant, and there are triable issues of fact as to whether the property would have been rented but for the vandalism damage. Therefore, we reverse and remand for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND

### Vandalism Claim

Plaintiff and appellant Ventura Kester, LLC, owns a commercial building in Sherman Oaks. Defendant and respondent Folksamerica Reinsurance Company issued a commercial building owner's policy to Ventura effective September 7, 2006, to September 7, 2007. At the time the policy was issued, a tenant leased the property.

The policy provided up to $2.76 million for structures and $552,000 for lost rents as a result of damage to a covered structure. The policy stated: "Subject to the terms, conditions and limitations of this policy, **we** insure **you** against financial loss resulting from: [¶] 1. direct physical loss of or damage to covered property caused by an **accident**; and [¶] 2. the enforcement of any ordinance, law or code which prohibits repair of a covered structure damaged by an **accident** and requires that any undamaged portion of the structure be demolished; and [¶] 3. rents including accrued rents which become uncollectible, and extra expense incurred to prevent loss of rents, because of damage to or destruction of covered structures caused by an **accident**."

The policy also stated: "Subject to the provisions contained in the LIMIT OF INSURANCE section and subject to all other terms and conditions of this policy the amount we will pay is calculated as follows: [¶] . . . [¶] 5. Rents [¶] **We** will pay: [¶]

2

a.  **your** net loss of rental income; and [¶]  b.  rents accrued but rendered uncollectible by reason of a covered loss at a location described on the Declarations Page; and [¶]  c. **your** extra expenses necessarily incurred to minimize **your** rental income loss, but only to the extent that the rental income loss **we** would otherwise pay is reduced."

The tenant vacated the property in late 2006.  On April 2, 2007, Ventura received a lease proposal from Equinox Fitness Clubs, but the proposal offered less money than a deal Ventura was negotiating with OfficeMax.  Ventura had recently leased another property to OfficeMax as well.  On April 30, 2007, OfficeMax and Ventura executed a letter of intent to enter into a lease for the property.

In May 2007, thieves entered the building, stole copper wire and pipes, and caused extensive damage to the property.  Ventura received a new lease proposal from Equinox and made a counter-proposal.  Ventura reported the vandalism damage to Folksamerica and submitted a notice of loss on June 26, 2007.  When adjusters inspected the property in July and August 2007, they discovered additional vandalism, which they treated as a second claim.  The cost of repair was estimated to be $1 million.

In August or September 2007, OfficeMax declined to lease the property.  In September, Ventura negotiated to lease the property for a Crunch fitness center.  Ventura declined to make the deal, because Crunch did not provide a sufficient letter of credit.

On November 21, 2007, Folksamerica provided a check to Ventura in the amount of $383,989.90 and another in the amount of $128,973.71.  Ventura did not agree the amount was adequate to repair the damage and could not commence repairs until the claim was fully paid.  A construction company estimated that it would take up to a year to repair the vandalism damage, including building code upgrades, plan check, and permits.

In May 2008, Equinox made another offer to lease the property, but ultimately, negotiations were not successful due to the size of the property.

On July 7, 2009, Ventura executed a release of its claims, except the claim for lost rents.  Folksamerica provided a check to Ventura in the amount of $414,460.42 in final settlement of Ventura's property damage claims.

On June 9, 2010, the insurer denied the loss of rents claim, because there was no signed lease in effect at the time of the loss.

## Complaint and Court Proceedings

On June 11, 2010, Ventura filed the instant action for breach of contract and breach of the covenant of good faith and fair dealing against the insurer. Ventura alleged that it was entitled to lost rent from May 2007 through July 2010, at a monthly rental rate of $100,000 for a total loss of rent of $3.8 million. Ventura also alleged a cause of action for professional negligence against insurance agent Allen Lawrence & Associates, Inc.

On May 12, 2011, Ventura's managing agent Max Netty explained in his deposition that OfficeMax declined to lease the property for two reasons. The first reason was that Ventura could not say when it would be able to deliver the property in a "shell" form, which would include the store front, concrete floors, heating, ventilation, air conditioning, and electrical. OfficeMax sought to open a target number of stores each year and needed to be able to schedule the store opening. Ventura could not guarantee a delivery date within a year, because it was not certain when insurance proceeds would be received to repair the vandalism damage. The second reason was that OfficeMax's new chief executive officer had halted new leases. The company was closing stores and not interested in new locations.

Netty stated that Ventura has not repaired the property, because it is more sensible to secure a tenant first. Otherwise, Ventura might waste money on items that needed to be altered or relocated for the new tenant. The building is not functional, but the space looks fine and does not discourage people from viewing the property and offering to lease it. A health spa, a yoga studio, and another fitness center had all expressed interest and entered into negotiations.

Ventura filed a motion for summary adjudication as to whether the policy required an executed tenant lease to recover for loss of rents and extra expense. In addition to lost rent, Ventura claimed other expenses of $404,872.27.

4

Folksamerica filed a competing motion for summary judgment on the ground that Ventura could not show that it had lost rent as a result of the property damage. In support of Folksamerica's motion, it submitted the declaration of a real estate expert explaining that a letter of intent is a nonbinding agreement memorializing preliminary discussions. The letter of intent signed by OfficeMax was subject to formal documentation of the lease and the approval of OfficeMax's real estate committee.

Folksamerica provided a declaration from OfficeMax Real Estate Committee member Steven Cogan. Cogan stated that on September 17, 2007, the committee decided to end lease discussions with Ventura, because the economics reflected in their financial model were not acceptable. Cogan did not recall any discussion about property damage or availability, nor did he recall being made aware of property damage prior to the meeting. Folksamerica opposed Ventura's motion for summary adjudication based on the same arguments.

Ventura opposed Folksamerica's motion for summary judgment on the grounds that the policy did not require a tenant or executed lease, and triable issues of fact existed as to whether Ventura lost rents as a result of the vandalism damage and the delay in receiving payment on the claim. Ventura submitted Netty's declaration stating that OfficeMax's regional manager said the company would not be able to rent the building because it was unclear when the building would be ready, due to the pending insurance claim for vandalism damage. The regional manager also said that OfficeMax was putting a hold on new leases.

Folksamerica objected to the statements by OfficeMax's regional manager in Netty's declaration as hearsay. A hearing was held on the competing motions on February 22, 2012. The trial court found the plain language of the policy did not provide coverage for lost rents when there was no tenant in the building. The court added, "I just don't think you can insure against an opportunity cost, especially one as speculative [as] here, without writing it into the policy." The court entered an order granting Folksamerica's motion for summary judgment and denied Ventura's motion for summary adjudication. On April 17, 2012, the court entered judgment in favor of Folksamerica.

5

Ventura filed a timely notice of appeal. It also settled its claims against the insurance agent.

## DISCUSSION

### <u>Standard of Review</u>

"The standard for deciding a summary judgment motion is well-established, as is the standard of review on appeal." (*Richard B. LeVine, Inc. v. Higashi* (2005) 131 Cal.App.4th 566, 572.) "A defendant moving for summary judgment has the burden of producing evidence showing that one or more elements of the plaintiff's cause of action cannot be established, or that there is a complete defense to that cause of action. [Citations.] The burden then shifts to the plaintiff to produce specific facts showing a triable issue as to the cause of action or the defense. [Citations.] Despite the shifting burdens of production, the defendant, as the moving party, always bears the ultimate burden of persuasion as to whether summary judgment is warranted. [Citation.]" (*Garcia v. W&W Community Development, Inc.* (2010) 186 Cal.App.4th 1038, 1041 (*Garcia*).)

"On appeal, we review de novo an order granting summary judgment. [Citation.] The trial court must grant a summary judgment motion when the evidence shows that there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. [Citations.] In making this determination, courts view the evidence, including all reasonable inferences supported by that evidence, in the light most favorable to the nonmoving party. [Citations.]" (*Garcia, supra,* 186 Cal.App.4th at p. 1041.)

We also conduct de novo review of the trial court's order granting summary judgment based on an interpretation or application of the provisions of an insurance policy. (*Palp, Inc. v. Williamsburg National Ins. Co.* (2011) 200 Cal.App.4th 282, 289 (*Palp*).) "'Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation. [Citation.] "The fundamental rules of contract

6

interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties. 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.,* § 1639.) The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" (*id.,* § 1644), controls judicial interpretation. (*Id.,* § 1638.)' [Citations.] A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. [Citation.] But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract." [Citation.] . . .' [Citation.]" (*TRB Investments, Inc. v. Fireman's Fund Ins. Co.* (2006) 40 Cal.4th 19, 27.)

"'Courts will not strain to create an ambiguity where none exists.' [Citation.] ""'If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage." [Citation.]' [Citation.]" [Citation.]' [Citation.]" (*Palp, supra*, 200 Cal.App.4th at p. 290.)

"An insurance policy's coverage provisions must be interpreted broadly to afford the insured the greatest possible protection, while a policy's exclusions must be interpreted narrowly against the insurer. [Citation.] The exclusionary clause must be '"*conspicuous, plain and clear.*"' [Citation.] 'This rule applies with particular force when the coverage portion of the insurance policy would lead an insured to reasonably expect coverage for the claim purportedly excluded.' [Citation.]" (*Palp, supra*, 200 Cal.App.4th at p. 290.)

"The insured has the burden of establishing the claim comes within the scope of coverage, and the insurer has the burden of establishing the claim comes within an exclusion. [Citation.] To prevail, the insurer must establish its interpretation of the

policy is the only reasonable one.  [Citation.]  Even if the insurer's interpretation is reasonable, the court must interpret the policy in the insured's favor if any other reasonable interpretation would permit coverage for the claim.  [Citation.]" (*Palp, supra*, 200 Cal.App.4th at p. 290.)

## Coverage for Loss of Rents

Ventura contends the policy covers lost rents during the time required to repair the property damage, regardless of whether there was an existing tenant.  Folksamerica contends the policy covers lost rent only if Ventura had a tenant in place.  We conclude the lost rents provision is ambiguous, and the policyholder would have a reasonable expectation of coverage for rents that were actually lost as a result of the property damage.

Insurance against the loss of rental income is a form of business income coverage. (11 Couch on Insurance (3d ed. 2005) § 167:1, pp. 167-6-167-7.)  "A lessor's 'rent insurance' or 'rent loss insurance' provides reimbursement for loss of rents actually sustained by the owner or lessor of property on occupied portions of premises, which are caused to be untenantable, for the period of time necessary to restore the property to tenantable condition."  (*Id.*, § 167:26, p. 167-33.)

The policy provisions at issue in this case are ambiguous.  The policy provides coverage against the loss of rents due to damage to a covered structure.  Subject to express limitations, the insurer promises to pay the insured's net loss of rental income. Folksamerica suggests the provision for loss of rents should be interpreted narrowly to mean rent from an existing tenant which is uncollectible as a result of damage to the covered property.  However, the plain language of the policy does not limit recovery or calculate lost rents in this manner.  The provisions provide coverage for the loss of rents the owner would have collected, but for the property damage.  Rental property is often vacant between tenants.  Ventura's policy provided coverage for damage to the building regardless of whether the property was vacant.  An owner of rental property often

depends on income from rent payments to cover fixed costs, such as mortgage payments, utilities, and taxes. If the building would have been rented to a new tenant but for the property damage, the owner has lost the rents that would have been received from a new tenant. Since the owner's need for rental income and loss of rental income did not depend on having a tenant in place at the time of the covered incident, it was reasonable for the policyholder to expect the policy covered the owner's actual lost rent as a result of the damage and did not depend on the fortuity of having a tenant in place when the damage occurred.

If the insurer had wanted to limit the recovery or calculate the rents based on existing tenants at the time of the building damage, it clearly could have written the policy to provide that. For example, in *Whitney Estate Co. v. Northern Assurance Co. of London* (1909) 155 Cal. 521, 522 (*Whitney*), our Supreme Court considered a fire insurance policy which provided: "It is understood and agreed that in case the [covered] building or any part thereof shall be rendered untenantable by fire, this company shall be liable to the assured for the actual loss of rent ensuing therefrom, based upon the rentals in force from the rented portions of the premises at the time of fire, not exceeding the sum insured. Loss to be computed from the date of the fire for the time it would require to put the premises in tenantable condition, excluding from such time such portion thereof as may be consumed by a strike or by any other delay beyond the control of the assured."

In *Whitney*, the Supreme Court determined the policy at issue provided for recovery of gross rents, rather than net rents. (*Whitney*, *supra*, 155 Cal. at pp. 524-525.) The *Whitney* court noted well-settled law that "'the insured is entitled to recover under the policy only such loss as he has actually sustained, not exceeding the sum stipulated.' [Citation.]" (*Id.* at p. 524.) "[I]n the case of rents of a building it is not, in the nature of things, possible to determine, at any particular period, just what the income from rents for the ensuing year would be. It may be that a greater or a less part of the building may be occupied during the year than at its commencement. So, with the matter of expense. The annual outlay for elevator service, wages of janitors, light, and water will depend upon a

9

variety of contingencies which cannot be foretold.  Furthermore, the fact that a building is rendered untenantable may cause a loss of rents to the owner in ways that are even more incapable of measurement.  A building vacated by its tenants in consequence of fire may remain vacant, in whole or in part, long after it has been restored and is again ready for occupancy.  In view of all these uncertainties, it is perfectly competent for the parties to a contract of rent insurance, without in any degree violating the principle that the insurance shall furnish only indemnity against loss, to stipulate for a method of ascertaining and computing such loss.  We think the policy before us, fairly construed, does provide that the loss of rents shall be deemed to be the amount of rentals that would be collected by the insured during the period that may be required to restore the building to a tenantable condition, assuming that the rentals would have continued to be the same in amount as at the time of the fire. . . .  The insurance company agrees to be liable for the 'actual loss of rent ensuing' from the fire, and makes provision for the manner of determining the loss.  It is to be based upon the rentals in force from the rented portions of the premises at the time of fire and to be 'computed from the date of the fire for the time it would require to put the premises in tenantable condition.'  No elements except those of actual rentals at time of fire and time required for repair are mentioned.  The first of these elements is easily ascertainable, and special provision is made for arbitration as to the second, in the event of disagreement.  If it had been intended that any other item should enter into the computation, it seems reasonable to suppose that something would have been said regarding such other item." (*Id.* at pp. 524-525.)  In comparison, the lost rents provision at issue in the instant case does not expressly require lost rents to be calculated based on lease agreements in place at the time of the incident.  If the insurer had wished to impose this limitation, it could have done so.

Another example of a policy that expressly conditioned recovery of lost rents on an existing lease is described in *Certain Underwriters at Lloyd's London v. Hogan* (2001) 147 N.C.App. 715, 719-720.  The loss of rents provision in that case stated that if a covered peril made the insured premises rented to others under a "rental contract" unfit to live in, the insurer would cover the insured's actual loss of rents, less certain expenses.

The loss payment was limited to the shortest time required to repair the premises rented or held for rental, or the net rental proceeds under the "rental contract." "Rental contract" was defined in the policy as a written contract with a bona fide third party tenant who intended to personally occupy the insured premises for a specific term.

Folksamerica's citation to *MDW Enters. v. CNA Ins. Co.* (2004) 4 A.D.3d 338 is misplaced, because the policy at issue in that case contained a vacancy provision which excluded coverage when the building had been vacant for more than 60 days before the occurrence. Another case cited by Folksamerica, *De Crescenzo v. Capital Mut. Ins. Co.* (1992) 187 A.D.2d 793, 794-795, is not persuasive, because although the court stated there was lost rent coverage only if the premises were actually rented at the time of the loss, the opinion does not contain the policy language to explain the court's decision.

## Evidence of Loss of Rents

Folksamerica also contends Ventura cannot establish any actual loss of rents as a result of the property damage. We conclude a triable issue of fact exists as to whether Ventura actually lost rents.

Folksamerica's evidence showed the property damage did not prevent potential tenants from viewing the property, and it was not necessary to repair the damage to secure a tenant. Other than OfficeMax, potential tenants declined to lease the property due to the size of the building or other limitations unrelated to the vandalism damage. Folksamerica also provided the declaration of a committee member who voted to decline the OfficeMax lease because the economics were unfavorable and did not recall any discussion of delay or property damage. This evidence was not sufficient to establish as a matter of law that Ventura would not have rented the property during the time it took to adjust the claim and repair the damage.

There was evidence from which a trier of fact could conclude Ventura could have rented the property to a new tenant but for the property damage. Ventura had a long-term tenant until five months before the damage took place. Ventura received an offer from

11

one potential tenant for a lower rent payment than OfficeMax was offering. However, once the property was damaged, Ventura could not provide a delivery date to potential tenants, because it did not know when the insurance proceeds would be received. There was evidence OfficeMax declined to lease the property in part due to the delay required to resolve the insurance claim.[1] A triable issue of fact exists as to whether Ventura would have secured a tenant for the property but for the vandalism damage. Whether Ventura would have rented the property in the absence of the property damage, the fair market rental value, and whether Ventura acted reasonably to mitigate its damages by declining certain lease offers and showing the property for certain types of development are issues for a trier of fact to resolve. Therefore, Folksamerica's motion for summary judgment should have been denied.

---

[1] Folksamerica objected to certain evidence in the trial court as inadmissible hearsay, but the trial court did not rule on the objections and Folksamerica has not raised the objections on appeal. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534 [when the trial court does not expressly rule on evidentiary objections, the objections are presumed to be overruled and preserved for appeal].)

## DISPOSITION

The judgment and the order granting Folksamerica's motion for summary judgment are reversed.  The trial court is directed to enter a new and different order denying Folksamerica's motion for summary judgment.  Appellant Ventura Kester is awarded its costs on appeal.

KRIEGLER, J.

We concur:

TURNER, P. J.

MOSK, J.

13