Filed 11/15/21  Smith v. Financial Pacific Ins. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| MARSHALL W. SMITH, | B302014 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC711308) |
| v. | |
| FINANCIAL PACIFIC INSURANCE COMPANY, | |
| Defendant and Appellant, | |
| TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dennis J. Landin, Judge.  Affirmed in part, reversed in part, and remanded.

Law Offices of Richard A. Jones, Richard A. Jones and Jarrick S. Goldhamer for Plaintiff and Appellant.

Selman Breitman, Eldon S. Edson and Laura R. Ramos for Defendant and Appellant.

Weston & McElvain, Aaron C. Agness and Edmond Sung for Defendant and Respondent.

# *INTRODUCTION*

In this insurance coverage and bad faith action, we consider two different insurance policies. Plaintiff Marshall Smith, while riding a motorcycle, was injured in a collision with an SUV driven by Luke Gardner. Gardner's insurer accepted the claim and is not a party here. At issue is insurance provided to Gardner's father-in-law, Gerry Paddock, who was held vicariously liable for Gardner's negligence. Paddock was the sole proprietor of two businesses which operated under fictitious names.[1] One, a construction business, was Carmel Valley Construction. The other, a cattle ranching business, was Paddock Land & Cattle. Prior to the automobile accident, Paddock had suffered a stroke and was unable to handle the day-to-day affairs of Paddock Land & Cattle. His daughter, Emily, was his ranch manager. On the day of the accident, Emily had requested her husband, Gardner, to drive the SUV to some leased land and take care of the cattle. Gardner, who was not an employee of Paddock, agreed. He collided with motorcyclist Smith on his way to the property.

At the time of the accident, Paddock had policies from two different insurers. Travelers Property Casualty Company of America provided an Agribusiness policy, covering the operations of Paddock Land & Cattle. That policy contained an automobile exclusion. Financial Pacific Insurance Company provided liability insurance for Paddock's construction operations, Carmel Valley Construction. Its policy included automobile insurance. Gardner's accident was tendered to Travelers and Financial Pacific. Both denied coverage.

---

[1] We use "Paddock" alone to refer to Gerry Paddock, not any of his businesses.

2

In the underlying personal injury action between Smith and Paddock (and Gardner), the court entered a judgment in Smith's favor in excess of the combined policy limits of Travelers and Financial Pacific. Paddock then assigned both contractual and extra-contractual rights to Smith, and Smith brought suit against both insurers for breach of contract and bad faith.

Broadly speaking, the theories were these: (1) as against Travelers (which provided Agribusiness coverage to Paddock dba Paddock Land & Cattle, with an auto exclusion), Smith argued the auto exclusion did not apply, because that exclusion applied only when the vehicle was used by an insured, and Gardner was not an insured; and (2) as against Financial Pacific (which issued a policy in the fictitious business name Carmel Valley Construction, with auto coverage), Smith argued that the auto portion of the policy covered Paddock and all of his sole proprietorships, and was not limited to the construction business. On cross-motions for summary judgment/summary adjudication, the court concluded: (1) the Travelers policy did not cover the accident; (2) the Financial Pacific policy did provide coverage; but (3) Financial Pacific did not act in bad faith. The court entered judgment in favor of Travelers; and in favor of Smith as against Financial Pacific, in the full amount of the underlying judgment, in excess of policy limits. Smith appeals the judgment in favor of Travelers; Financial Pacific appeals the judgment against it on coverage; Smith cross-appeals the finding of no bad faith against Financial Pacific. We conclude: (1) the Travelers policy did not cover the accident; (2) the Financial Pacific policy did cover the accident; and (3) Financial Pacific did not negate a triable issue of fact on the bad faith claim. We therefore affirm the judgment in favor of Travelers, reverse the judgment against Financial Pacific, and remand for further proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

The facts and relevant policy language are largely, if not entirely, undisputed. The main issues on appeal are questions of coverage, which we resolve as a matter of law on undisputed facts. (*Crown Capital Securities, L.P. v. Endurance American Specialty Ins. Co.* (2015) 235 Cal.App.4th 1122, 1128.)

**1.     *The Accident***

On October 5, 2014, Gardner was driving his Bronco to Palo Corona Regional Park, where he planned to tend to Paddock's cattle. There were a number of motorcycles coming up behind him; the lead one was driven by Smith. Gardner slowed to turn left into the park; whether he used his turn signal was disputed. As the Bronco slowed, Smith decided to pass it on the left. As Smith began to pass, Gardner started his turn, and the vehicles collided. Smith lost control of the motorcycle and was thrown some distance. He was evacuated from the scene by helicopter. When the matter was ultimately tried, fault was apportioned 50/50 between Gardner and Smith.

**2.     *The Underlying Action***

*A.     Complaint*

On July 31, 2015, Smith brought suit against Gardner. He also named Paddock dba Paddock Land & Cattle and Paddock Land & Cattle as two additional defendants.[2] The action was

---

[2]     As we shall discuss below, although Smith had purported to sue Paddock dba Paddock Land & Cattle and Paddock Land & Cattle as two separate entities, the use of a fictitious business name does not create a separate legal entity. (*Pinkerton's, Inc. v. Superior Court* (1996) 49 Cal.App.4th 1342, 1348.) Thus, Paddock – the individual – was the only legitimate defendant. However, the record before us does not indicate whether this issue was raised in the underlying case, and both Paddock dba Paddock Land & Cattle and Paddock Land & Cattle remained

filed on a form complaint. In the complaint, Paddock dba Paddock Land & Cattle and Paddock Land & Cattle were alleged to be liable as employers and/or principals of Gardner. Smith specifically alleged that Gardner "was acting in the scope of his agency at the time of the accident for defendant Gerry Paddock, dba Paddock Land & Cattle, Paddock Land & Cattle and [Does]."

B.      *Travelers and Financial Pacific Deny Coverage*

Gardner was insured by GEICO. GEICO provided a defense to both Gardner and Paddock in the underlying action, although GEICO's policy limit was $15,000. The action was tendered to Travelers, whose Agribusiness policy to Paddock dba Paddock Land & Cattle had a $1,000,000 limit. The record is not entirely clear whether Travelers declined the defense; there is no dispute, however, that it declined coverage. The action was also tendered to Financial Pacific, who purported to insure "Carmel Valley Construction" with $1,000,000 of auto liability coverage. Financial Pacific refused to defend or indemnify Paddock in the underlying action.

C.      *Covenant Not to Execute*

On December 21, 2017, prior to the trial of the underlying action, Smith entered into a settlement with Gardner and one or more Paddock entities.[3] In exchange for a covenant not to

_____

named defendants in that action through the entry of judgment. We therefore refer to the Paddock entities exactly as the court did in the underlying action.

[3]      The agreement, at various times, mentions Paddock as an individual, Paddock dba Paddock Land & Cattle, and Paddock Land & Cattle. Financial Pacific argued that there was no assignment of rights under its policy, as the document did not encompass Paddock dba Carmel Valley Construction. As the trial

5

execute on the anticipated judgment, Gardner and the Paddock signatories assigned to Smith all their rights to indemnity from Travelers and Financial Pacific as well as their rights to extra-contractual damages, including bad faith.[4]

### D.    Judgment

The underlying personal injury action was tried to a referee over two days in February 2018.  The referee heard testimony and reviewed transcripts, declarations and other documentary evidence.  The referee found Smith's damages to be $4,000,000.  As he was 50 percent negligent, the net damages awarded were $2,000,000.[5]

As to the issue of the liability of Paddock dba Paddock Land & Cattle and Paddock Land & Cattle, the referee's written ruling – ultimately incorporated into the court's judgment – stated as follows:  "AGENCY - a major issue in the case was whether Luke Gardner was the agent of the Paddock defendants.  Clearly, he was.  At the time of the accident here involved, Gardner was driving on his way to land leased for cattle grazing by the Paddock defendants.  At that location, he was to feed, medicate, inspect and otherwise care for the cattle.  He was doing this at the request of and under the direction of Paddock Land & Cattle made by its Ranch Manager, Emily Paddock.  The evidence on this point was uncontroverted.  [¶]  Gardner was not an employee of the Paddock defendants, but employment is not required to

court did not address the issue, and Financial Pacific does not pursue it on appeal, we express no opinion on this dispute.

[4]      Smith also received the $15,000 GEICO policy limits.

[5]      The judgment ultimately entered in March 2018 included 10 percent prejudgment interest from May 2016, so the total exceeded all policy limits when entered.

establish an agency relationship. The CACI jury instructions dealing with agency ([Nos.] 3700 & 3701) and the cases cited there use the term 'agent' and 'employee' interchangeably. Gardner was not merely 'doing a favor'; he was doing Paddock's work, at Paddock's direction and under Paddock's control. [¶] Gardner was driving his own vehicle, but was not in a 'going or coming' situation, rather, he was using the vehicle in furtherance of the tasks assigned to him by Paddock. This is the essence of an agency relationship."

On March 29, 2018, judgment in the underlying action was entered in favor of Smith against Gardner, Paddock dba Paddock Land & Cattle, and Paddock Land & Cattle in the amount of $2,000,000 plus costs and prejudgment interest.

### 3. *Pleadings in the Current Action*

#### A. *Smith's Complaint*

On June 25, 2018, Smith, pursuant to the direct action statute (Ins. Code, § 11580, subd. (b)(2)) and his assignment that was part of the covenant not to execute, filed the current action against Travelers and Financial Pacific. He stated three causes of action: (1) breach of contract; (2) bad faith; and (3) declaratory relief.

As to breach of contract, Smith alleged that the defendant insurance companies violated their contractual duties to defend, indemnify and settle the underlying action. He alleged that, as a proximate result of their failure to defend and indemnify, the underlying trial resulted in a judgment in excess of $2.4 million.

As to bad faith, Smith enumerated a laundry list of ways in which the defendants purportedly violated the implied covenant of good faith and fair dealing – including that they failed to objectively evaluate the claim, interpreted their policies in an

7

unduly restrictive manner, and rejected settlement demands within policy limits.

B.     *The Insurance Companies' Answers*

Travelers and Financial Pacific both filed answers consisting of denials and affirmative defenses.  As relevant to this appeal, Financial Pacific's second affirmative defense claimed that its policy was issued to Carmel Valley Construction and provided no coverage to Paddock Land & Cattle or Gardner.

C.     *Financial Pacific's Cross-Complaint*

Financial Pacific also filed a cross-complaint, although it would not be filed until after Smith had filed his motion for summary adjudication against Financial Pacific.  The cross-complaint alleged three causes of action for declaratory relief (seeking declarations of no duty to defend, no duty to indemnify, and, in the alternative, the amount owed) and one to reform the policy.[6]  In its cause of action for declaratory relief regarding amount owed, Financial Pacific argued that the underlying action was based in part on stipulated evidence "and resulted in a judgment much greater than would have been given in a fully contested hearing."  The cause of action for reformation alleged that, to the extent its policy does not reflect the true intent of the parties to limit coverage to only liabilities arising out of Carmel Valley Construction, the policy should be reformed to reflect that intent.

**4.     *Cross-Motions on the Travelers Policy***

On February 18, 2019, Smith moved for summary adjudication that Travelers had a duty to indemnify for the underlying judgment against Paddock.  On March 6, 2019,

_____

[6]     Paddock died prior to the filing of the cross-complaint. Financial Pacific named the Estate of E. Gerry Paddock as a cross-defendant.  The estate is not a party to this appeal.

8

Travelers filed its own motion for summary judgment on the basis that its policy did not provide coverage for this accident.

The issue raised by the cross-motions was one of policy interpretation. We will set forth the relevant terms in more detail in our discussion. Suffice it to say, the policy contained an auto exclusion which applies whenever the car involved in the accident is driven by an "insured." In turn, the policy includes among the insureds "volunteer workers" who act "at the direction of and within the scope of duties determined by" the named insured. Here, Gardner was doing the work of Paddock Land & Cattle, as directed by Emily Paddock, its ranch manager. Travelers argued that this rendered him an insured, triggering the auto exclusion. Smith argued, to the contrary, that in order for Gardner to have been an insured "volunteer worker," he had to have been acting at the personal direction of Gerry Paddock himself. As he was not, Gardner was not an insured, and the auto exclusion did not apply.[7]

The trial court agreed with Travelers, concluding that Gardner was a volunteer worker and the auto exclusion applied. While the court's ruling was based on policy interpretation, it also noted that a ruling in favor of coverage would be inconsistent with the findings in the underlying judgment: "The Monterey court in the underlying action found Mr. Paddock and [Paddock Land & Cattle]'s liability based on their vicarious liability for Mr. Gardner's negligence because Mr. Gardner was found to be their agent. [Citation.] (Mr. Gardner was 'doing Paddock's work, at Paddock's direction and under Paddock's control.') However, as Plaintiff asserts, if [Paddock Land & Cattle]'s directions should

---

[7]    Although Smith argues that Gardner was not an insured, Smith seeks to hold Travelers liable for the entire underlying judgment due to its coverage of Paddock.

9

not be construed as Mr. Paddock's business activities, there should not have been any vicarious liability tied to Mr. Paddock and, therefore, Plaintiff should not have been allowed to reach Mr. Paddock's insurance in the first place." The court granted Travelers's motion and denied Smith's.

## 5. *Cross-Motions on the Financial Pacific Policy*

Contemporaneously with the cross-motions on Travelers's policy, Smith and Financial Pacific were also litigating cross-motions for summary adjudication. On February 18, 2019, Smith moved for summary adjudication of two issues: (1) Financial Pacific had a duty to indemnify Paddock for the accident; and (2) as to Financial Pacific's second affirmative defense – its policy covered only Carmel Valley Construction, not Paddock Land & Cattle. On April 22, 2019, Financial Pacific moved for summary judgment on the basis that its policy provided no coverage for the accident, as it covered only Carmel Valley Construction activities. In the alternative, it moved for summary adjudication of the issue of bad faith.[8] Specifically, although not exclusively, Financial Pacific relied on the genuine dispute doctrine to shield it from bad faith liability. (E.g., *Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 347.)

As with the Travelers's cross-motions, we will discuss the Financial Pacific cross-motions in greater detail in the Discussion

---

[8] Financial Pacific also sought summary adjudication of Smith's claim for punitive damages against it. As Smith had sought punitive damages only in connection with bad faith, and Financial Pacific had argued that punitive damages were unavailable because the bad faith claim was meritless, the claim for punitive damages rises and falls with the cause of action for bad faith, and we need not discuss them separately.

10

section below. In summary, it was not disputed that Financial Pacific provided Paddock with auto insurance. The issue presented by these motions was whether the auto coverage provided by the Financial Pacific policy extended to Paddock's Paddock Land & Cattle business activities or whether it was limited to Paddock's Carmel Valley Construction activities.

Financial Pacific's argument depended largely on the name of the "insured" in its policy ("Carmel Valley Construction c/o Gerry Paddock") and the designation of the insured's business as "CONSTRUCTION."

Smith, in contrast, relied on legal authority that a fictitious business name is not a legal entity that can be an insured; thus, Financial Pacific's insured had to be Paddock, not Carmel Valley Construction. Smith also relied on a great deal of extrinsic evidence (discussed below) supporting the proposition that Paddock's reasonable expectation was that the auto liability coverage of the Financial Pacific policy applied to all his endeavors.

On September 16, 2019, the trial court entered its order. The court ruled in favor of Smith on coverage, concluding that Carmel Valley Construction was a legal fiction and Financial Pacific's insured was simply Paddock. The court further held that, even if there were ambiguities in the policy, the ambiguities must be construed in favor of the objectively reasonable expectations of the insured, which would also result in coverage, based on Smith's evidence.

However, the court granted Financial Pacific summary adjudication of Smith's cause of action for bad faith, on the basis of the genuine dispute doctrine. The court stated, "Upon review of [Financial Pacific]'s arguments, the Court finds that [Financial Pacific] did not unreasonably and in bad faith withhold payment

11

of Mr. Paddock's claim because there was a genuine dispute as to policy coverage."

## 6.     *Entry of Judgments and Appeals*

Judgment was entered in favor of Travelers, based on the ruling in its favor on the cross-motions for summary judgment. Financial Pacific objected to the prejudgment and postjudgment interest, but not the $2,000,000.  It submitted its own proposed judgment for judgment to be entered in favor of Smith on his breach of contract cause of action in a blank amount.  Financial Pacific's proposed judgment also stated "Financial Pacific Insurance Company's cross-complaint has been adjudicated through the Court's September 16, 2019 Order.  Financial Pacific Insurance Company shall take nothing from cross-defendants."

After briefing, the court entered judgment in favor of Smith and against Financial Pacific, in the amount of $2,763,860.85. Financial Pacific filed a timely notice of appeal.  The following day, Smith filed a notice of cross-appeal.

## DISCUSSION

We first discuss the standard of review and an issue regarding fictitious business names that applies to both policies. Next, we address the judgment in favor of Travelers.  We agree with the trial court that the auto exclusion applies, and affirm the judgment.  We then turn to the judgment against Financial Pacific.  We agree with the trial court that the policy provided coverage for the accident, so summary adjudication on the issue of indemnity was appropriately granted to Smith.  However, we disagree on the issue of bad faith, as the genuine dispute doctrine does not support the grant of summary adjudication.  We therefore remand for further proceedings as between Smith and Financial Pacific only.

12

1.      ***Standard of Review and Norms of Contractual Interpretation***

"'"When determining whether a particular [insurance] policy provides a potential for coverage . . . , we are guided by the principle that interpretation of an insurance policy is a question of law."'  [Citation.]  The standard of review is de novo with respect to an order granting summary judgment when, on undisputed facts, the order is based on the interpretation or application of the terms of an insurance policy.  [Citation.]" (*Crown Capital Securities, L.P. v. Endurance American Specialty Ins. Co., supra*, 235 Cal.App.4th at p. 1128.)

"'"In reviewing de novo a superior court's summary adjudication order in a dispute over the interpretation of the provisions of a policy of insurance, the reviewing court applies settled rules governing the interpretation of insurance contracts . . . .  [¶]  '"While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply."  [Citations.]  "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties."  [Citation.]  "Such intent is to be inferred, if possible, solely from the written provisions of the contract."  [Citation.]  "If contractual language is clear and explicit, it governs."  [Citation.]'  [Citation.]"  [Citations.]'" (*Crown Capital Securities, L.P. v. Endurance American Specialty Ins. Co., supra*, 235 Cal.App.4th at p. 1128.)

"A policy provision is ambiguous when it is susceptible to two or more reasonable constructions.  [Citation.]  Language in an insurance policy is 'interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract.'  [Citation.]  'The proper question is whether the [provision or] word is ambiguous in the context of *this* policy and

13

the circumstances of *this* case.  [Citation.]  "The provision will shift between clarity and ambiguity with changes in the event at hand."  [Citation.]'  [Citation.]  Ambiguity ' " 'is resolved by interpreting the ambiguous provisions in the sense the [insurer] believed the [insured] understood them at the time of formation.  [Citation.]  If application of this rule does not eliminate the ambiguity, ambiguous language is construed against the party who caused the uncertainty to exist.  [Citation.]'  'This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, "the objectively reasonable expectations of the insured." ' "  [Citation.]  "Any ambiguous terms are resolved in the insureds' favor, consistent with the insureds' reasonable expectations." '  [Citation.]"  (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470–471.)

The insured has the burden of establishing the claim comes within the scope of coverage and the insurer has the burden of establishing the claim comes within an exclusion.  The insurer must establish its interpretation of the policy is the only reasonable one.  Even if the insurer's interpretation is reasonable, if any other reasonable interpretation would permit coverage for the claim, the court must interpret the policy in the insured's favor.  (*Ventura Kester, LLC v. Folksamerica Reinsurance Co.* (2013) 219 Cal.App.4th 633, 641.)

## 2.     *A Fictitious Business Name is Not a Legal Entity*

Each policy implicated in this case included a fictitious business name as the insured.  The Travelers policy insured "E. Gerry Paddock dba Paddock Land & Cattle."  The Financial Pacific policy named "Carmel Valley Construction c/o Gerry Paddock."

14

"Use of a fictitious business name does not create a separate legal entity."  (*Pinkerton's, Inc. v. Superior Court, supra*, 49 Cal.App.4th at p. 1348.)  There is no difference between the owner and its fictitious business name.  (*Ibid.*)  A sole proprietorship is not a legal entity separate from its individual owner.  (*Ball v. Steadfast-BLK* (2011) 196 Cal.App.4th 694, 701.)

This established, we now turn to the summary judgment motions.

## 3.    *The Court Correctly Granted Travelers Summary Judgment*

Travelers obtained summary judgment on the basis that its policy, issued to "E. Gerry Paddock dba Paddock Land & Cattle," did not provide coverage for the accident.

### A.    *Relevant Policy Terms*

The parties agreed, via separate statements on summary judgment/adjudication, to the relevant terms of the policy.  The insured is "E. Gerry Paddock dba Paddock Land & Cattle."  When the policy refers to "you," it means the named insured.  The insuring clause provides, in pertinent part, "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  There is no dispute that Paddock was "legally obligated to pay" the judgment in the underlying action.  The question is whether the judgment encompassed damages "to which this insurance applies."

Travelers relied on the policy's auto exclusion.  That provision states as follows:  "This insurance does not apply to: [¶] . . . [¶] **g. Aircraft, Auto Or Watercraft** [¶] 'Bodily injury' or 'property damage' arising out of the ownership, maintenance, use or entrustment to others of any aircraft, 'auto' or watercraft owned or operated by or rented or loaned to any

15

insured.  Use includes operation and 'loading and unloading'.  [¶] This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the 'occurrence' which caused the 'bodily injury' or 'property damage' involved the ownership, maintenance, use or entrustment to others of any aircraft, 'auto' or watercraft that is owned or operated by or rented or loaned to any insured.' "

The parties agree that the damages arose out of the "use" of an auto.  The disagreement is on whether the auto was used "by . . . any insured."  In other words, if Gardner – who was driving his own SUV at the time – was an "insured," the auto exclusion applies and there is no coverage.

The parties agreed that, "[i]n addition to providing coverage for the named insured, Travelers' policy also identifies additional insureds:  'Your "volunteer workers" only while performing duties related to the conduct of your business or your "employees" . . . but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.' "  Gardner concededly was never Paddock's employee.  The coverage issue thus turns on whether Gardner was a "volunteer worker."[9]  The parties further agreed: "The policy specifically defines 'volunteer worker' as 'a person who is not your "employee", and who donates his or her work and acts **at the direction of and within the scope of duties determined by you**, and is not paid a fee, salary or compensation by you or anyone else for their work performed for you.'  (Emphasis added.)"

---

[9]     There is no dispute that, if Gardner was a "volunteer worker," he was "performing duties related to the conduct of your business."

*B.     Arguments on Appeal*

The language bolded above is the heart of matter.  When Gardner was driving to Palo Corona Regional Park to care for Paddock's cattle at the immediate direction of his wife, ranch manager Emily Paddock, was he acting "at the direction of and within the scope of duties determined by" the named insured?  As the named insured was "E. Gerry Paddock dba Paddock Land & Cattle," and the referee in the underlying action expressly concluded that Gardner was acting "at the request of and under the direction of Paddock Land & Cattle made by its Ranch Manager, Emily Paddock," the trial court concluded in ruling on summary judgment that Gardner was acting at the direction of and within the scope of duties determined by the named insured, therefore rendering him a volunteer worker.  As such, Gardner was an insured under the policy, thereby triggering the auto exclusion.  On appeal, Smith argues that because the fictitious business name of Paddock Land & Cattle is not a legal entity distinct from Paddock himself, Paddock was the sole named insured and only volunteers who acted "at the direction of and within the scope of duties determined by" Paddock alone qualified as insureds under the policy.

*C.     Gardner Was an Insured Under the Policy*

Smith's interpretation of the policy is simply not reasonable.  We agree that Paddock himself was the insured.  Nonetheless, Gardner acted at the direction of and within the scope of duties determined by Paddock – although this direction was conveyed by Paddock's ranch manager Emily, Paddocks's daughter and Gardner's wife.  There is no language in the policy stating that, in order to be a considered a covered volunteer

17

worker, the worker must act at the *personal* direction of the named insured.[10]

More importantly, we return to the language of the underlying judgment. The referee found, "Gardner was not merely 'doing a favor'; he was doing Paddock's work, at Paddock's direction and under Paddock's control." Whether the referee was referring to Paddock by his given name or to his business operation does not matter. Paddock Land & Cattle does not exist as a legal entity; it is Paddock. The very same fictitious business name rule that makes Paddock the insured (when applied to the policy), makes Paddock the principal of Gardner (when applied to the underlying judgment). Smith cannot argue that Paddock stands in the stead of Paddock Land & Cattle in the named insured clause but not in the underlying judgment. Paddock is the insured; for our purposes, Paddock was Gardner's principal; and Paddock directed and controlled Gardner, rendering Gardner a volunteer worker and, thus, an insured.

### 4. *Even if the Policy is Ambiguous, We Construe it in Favor of Gardner as an Insured*

Even if there is an ambiguity in the clause – as to whether a volunteer constitutes an insured volunteer worker only if directed personally by Paddock or if he can be insured if directed by one of Paddock's agents – it is the latter interpretation that protects the objectively reasonable expectations of the insured. We are concerned with a clause that defines volunteer workers as

---

[10] Paddock argues that the trial court improperly rewrote the policy, by replacing the word "you" in "at the direction of and within the scope of duties determined by you" with "you or others on your behalf." We disagree; it is Paddock who rewrites the policy by requiring the direction to have been personal, rather than through an agent.

18

insureds – i.e., it broadens coverage. An owner of a ranching business such as Paddock would expect his volunteer workers to be covered by his policy if they were following the directions conveyed to them by Paddock's ranch manager – not excluded from coverage unless he personally gave them the direction. (See *Sprinkles v. Associated Indemnity Corp.* (2010) 188 Cal.App.4th 69, 81–82 [if a policy is ambiguous, we resolve the ambiguity in favor of a more expansive reading of the word "insured," even if it results in the expanded application of an exclusion and limits coverage in the case at hand].)

Moreover, we cannot overlook the larger picture. This policy contained an auto exclusion, and neither the insured nor the insurer expected it to cover auto accidents. If Paddock had been driving rather than Gardner, there would have been no coverage. If Paddock's wife had been driving, there would have been no coverage. If it had been any of Paddock's employees in the driver's seat, there would have been no coverage. If Gardner had been using one of Paddock's vehicles, there would have been no coverage. It is only because Gardner was using his own vehicle while doing unpaid work for Paddock under Emily's direction that Smith asserts the auto exclusion does not apply. It is difficult to conceive of any insured who would agree to exclude coverage for himself, his spouse, his employees, and the volunteers he personally directed, but purchase coverage for vicarious liability only for volunteers directed through agents.[11]

---

[11]    In his opening brief, Smith concedes that this may be "an unintended gap in the policy's definitions and parameters," but believes Travelers is bound by the language of the policy. As we have said, the plain language of the policy favors Travelers. When we consider the possibility of an ambiguity in the policy,

The Travelers policy provided no coverage for this accident. As there was no coverage under the policy, there was also no duty to defend. (*Schaefer/Karpf Productions v. CNA Ins. Companies* (1998) 64 Cal.App.4th 1306, 1312.) Summary judgment in favor of Travelers was therefore correctly granted.

**5.** *The Judgment Against Financial Pacific Must Be Partially Reversed*

We next turn to the cross-motions involving the Financial Pacific policy. This discussion will encompass three issues: whether there was coverage; whether Financial Pacific met its burden to establish there was no triable issue of fact of bad faith; and whether there are issues that may arise on remand.

    *A.* *Summary Adjudication in Favor of Smith on the Duty to Indemnify Was Correct*

        1. <u>Arguments of the Parties and Evidence Presented in the Trial Court</u>

On the question of coverage, the cross-motions of Financial Pacific and Smith argued in the trial court that their interpretation of the policy was correct as a matter of law. Smith focused on the fact that the insured was Carmel Valley Construction, which was indisputably a fictitious business name of Paddock. Smith argued that Paddock, the individual, was the insured, and received auto coverage with respect to all of his businesses, including Paddock Land & Cattle.[12] Financial

---

we are concerned with the objectively reasonable expectations of the insured, not an "unintended gap."

[12] Financial Pacific's policy had a number of different types of auto coverage, described by number. In this case, Paddock purchased among others, coverage "09," which applied to autos Paddock did not own, but which were used in connection with his

20

Pacific, for its part, drew attention to the fact that its insured was "Carmel Valley Construction." It argued that the fictitious business name issue was a "red herring," because, regardless of the named insured, "the policy on its face still only covers construction related operations." Financial Pacific emphatically pointed to the absence of any mention of Paddock Land & Cattle in the policy, and claimed that the declarations page of the policy demonstrates that the policy was intended to cover only "construction" and "aggregate hauler" risks.

Both parties also submitted evidence beyond the plain language of the policy to support the argument that their interpretation was in line with the reasonable expectations of the insured. Financial Pacific submitted a declaration to the effect that it does not issue auto policies to ranching businesses at all. Smith, in contrast, relied on a number of facts demonstrating that Paddock reasonably believed the Financial Pacific policy covered Paddock Land & Cattle operations. These facts included: (1) several individuals who worked for Paddock Land & Cattle, but not Carmel Valley Construction, were specifically listed on the application as drivers to be covered by this policy; (2) several vehicles used in the business of Paddock Land & Cattle were specifically listed as covered by this policy;[13] (3) Monterey

_____

business. "This includes 'autos' owned by your employees or partners or members of their households but only while used in your business or your personal affairs." Smith argued that, since the insured was actually Paddock, the reference to "your business" included Paddock's ranching business as well as his construction business.

[13] In fact, the policy was amended for the purpose of "[a]dding 1951 [t]railer" for an additional $65 premium. The trailer was "used in relation to Mr. Paddock's cattle ranching operations at

21

Peninsula Regional Park District – which leased the grazing rights at Palo Corona Regional Park to Paddock Land & Cattle – had required a certificate of insurance reflecting auto coverage as part of its lease, which Financial Pacific then supplied; and (4) when Paddock had applied for the Financial Pacific policy, his application includes the answer "N" (for "No") to the question asking "DOES APPLICANT HAVE OTHER BUSINESS VENTURES FOR WHICH COVERAGE IS NOT REQUESTED?"

Financial Pacific did not dispute these facts. It chose instead to challenge their relevance. Financial Pacific argued that the application was handled – and the certificate of insurance issued – by Paddock's insurance broker, Neilson & Phillips. Financial Pacific took the position that Neilson & Phillips was an independent broker, and its knowledge and actions could not be imputed to Financial Pacific. This, in turn, raised the question of whether Neilson & Phillips was an agent who could bind Financial Pacific. Smith submitted a document from the Department of Insurance website indicating that Neilson & Phillips was a licensed broker-agent "authorized to transact on behalf of" a number of insurers, including Financial Pacific.

### 2. The Trial Court's Ruling

On summary judgment, the trial court concluded that the insured was Paddock, not Carmel Valley Construction, and the policy covered Paddock with respect to all of his business activities. The court also observed that, while specific coverage limitations could have been set out in the declarations page of the policy, there were none. Finally, if there were ambiguities, the

---

the Palo Corona Regional Park; [and] was occasionally used to haul hay fed to the cattle at Palo Corona Regional Park."

policy must be interpreted in favor of coverage. The trial court concluded: "As many courts recognized, the responsibility lies in the insurer for any ambiguities or uncertainties existing in the insurance policy language, and the rule of construction protects the objectively reasonable expectations of the insured."

### 3. Analysis: The Policy Does Not Limit Coverage to Paddock's Carmel Valley Ranch Operations

As we have discussed, a fictitious business name does not stand on its own as a new legal entity; the individual who is operating the fictitiously named business remains the relevant legal entity. In *Providence Washington Ins. Co. v. Valley Forge Ins. Co.* (1996) 42 Cal.App.4th 1194 (*Providence*), Division One of the First Appellate District considered the application of this legal principle in the specific context of insurance. In *Providence*, a number of persons were riding in a rented van when one of the van's tires exploded, causing the van to overturn. The injured victims sued on the basis that the van's owner, Paul Hifai, had negligently maintained and rented the van. (*Id.* at p. 1198.) Hifai operated a number of businesses under fictitious business names; and had multiple insurance policies covering himself "dba" the different business names. Specifically, he owned a rental car business, through which he had rented the van to the victims, and a gasoline service station business, through which he had serviced the van. The insurer covering Hifai's rental car business defended and settled the actions against Hifai, then that insurer sought contribution from the insurers who had provided coverage to Hifai's service station business. (*Ibid.*)

The policies covering the service station business excluded coverage for the use of an auto owned by the "insured." (*Providence, supra*, 42 Cal.App.4th at p. 1198.) The van was owned by the rental car business, which was nominally different

23

from the service station business. This did not, however, preclude the owned-auto exclusion from applying. Although the van was registered to the rental car business, that fictitiously named business was not a legal entity; its owner, Hifai, owned the van. (*Id.* at p. 1199.) Similarly, even though the service station policies purported to insure Hifai dba the service stations, the insured was not the service stations but Hifai himself. "[A] sole proprietorship like Tennyson Mobil Service is not a legal entity. An 'insured' must be a legal 'person,' such as an individual, partnership, or corporation. [Citation.] The designation 'dba' or 'doing business as' simply indicates that Hifai operates his sole proprietorship under a fictitious business name. [Citations.] 'The designation "d/b/a" means "doing business as" but is merely descriptive of the person or corporation who does business under some other name. Doing business under another name does not create an entity distinct from the person operating the business.' [Citation.] The business name is a fiction, and so too is any implication that the business is a legal entity separate from its owner. Here, our conclusion that Hifai individually, and not his business, is the insured is supported by the identification of the insured's status, in both policies, as an individual. Accordingly, Hifai is the insured and the van he owned is subject to the policy exclusion." (*Id.* at p. 1200.)

The *Providence* court recognized that there was contrary authority in other states, but disagreed with it. (*Providence, supra*, 42 Cal.App.4th at pp. 1201–1202.) It concluded the policy language was unambiguous. "The insured is the individual, and the 'dba' designation simply means that the individual operates under a fictitious name." (*Id.* at p. 1202.) Nor did the court find the "dba" language to be a limiting phrase restricting the meaning of the named insured. The court recognized that an

24

insurer *could* limit coverage to certain business operations by means of "specific exclusions or endorsements." (*Ibid.*) But using a "dba" in the name of the insured was not sufficient to do so.

Financial Pacific disagrees with *Providence*, arguing that it is "against the weight of judicial authority," and relying on a number of out of state cases instead. Typical of those cases is *Musselwhite v. Florida Farm General Ins. Co.* (Fla.Dist.Ct.App. 2019) 273 So.3d 251 (*Musselwhite*). That case involved a corporate entity, JODH3, which operated a feed store under the fictitious business name of "Bell Feed & Farm," and obtained insurance for it. The insurance contained a specific endorsement limiting coverage to injury arising out of the operation, maintenance, or use of identified premises, and described the premises as the feed store. (*Id.* at p. 253.) Later, JODH3 began a new, well drilling business, which it gave the fictitious name "Bell Feed & Farm, Well & Pump." When JODH3's principal sought insurance for the well drilling business, he learned that his feed store insurers did not cover drilling operations, and another insurer wanted more money than he could then afford. He chose not to obtain coverage for the well drilling business. (*Id.* at p. 253.) When an employee of the well drilling business was later injured drilling a well, he sought to recover against JODH3's policy for Bell Feed & Farm, on the basis that both Bell Feed & Farm and Bell Feed & Farm, Well & Pump were fictitious business names of the single legal entity JODH3. (*Id.* at p. 254.)

The *Musselwhite* court recognized there was law on both sides of the issue, including *Providence*. It rejected *Providence*, with the following analysis: "We conclude that the greater weight of authority supports the trial court's conclusion that the 'd/b/a' designation limited liability to JODH3's feed store business operated under the fictitious name. To hold otherwise would

25

frustrate the intent clearly expressed in the policy declarations, subject [the insurers] to open-ended exposure to liability for any new business operations that JODH3 might unilaterally decide to undertake, and force [the insurers] to insure risks that they never contracted to cover. JODH3 cannot be allowed to effectively rewrite the policy by requiring [the insurers] to insure risks arising from a well drilling business that did not exist when the policy terms were agreed upon." (*Id.* at p. 255.)

We believe *Providence* and *Musselwhite* can be reconciled. *Providence* itself recognized that a policy could limit coverage to a particular business by means of "specific exclusions or endorsements." The policy in *Musselwhite* contained such an endorsement, limiting coverage to injuries arising out of operation of the feed store. Indeed, the *Musselwhite* court relied on that endorsement as an additional basis for its holding. (*Musselwhite, supra*, 273 So.3d at pp. 256–257.) Other California authority is agreement. The "dba" designation alone does not trigger coverage for all of an owner's unrelated business entities; the court must review the policy as a whole. (See, e.g., *Fidelity & Deposit Co. v. Charter Oak Fire Ins. Co.* (1998) 66 Cal.App.4th 1080, 1083–1088 [when an insurer issues a policy to a bank "dba" a motel it acquired in Arkansas, and the policy specifies the business insured is a motel, and includes a hotel and motel endorsement, the policy does not cover the bank's construction activities in California].)

In short, California law regarding fictitious business names in insurance policies is as follows. A fictitious business name is not a legal entity and cannot be an insured; the owner of the fictitious business is the insured. However, courts must consider the policy as a whole; specific exclusion or endorsement language could limit the coverage to the activities of the named business.

26

Here, the named insured is "Carmel Valley Construction." Although the policy does not identify Carmel Valley Construction as a fictitious business name of Paddock, it is undisputed that it is. Carmel Valley Construction is not the insured, Paddock is. Indeed, Financial Pacific had previously filed a certificate of insurance with the California Department of Motor Vehicles, indicating that its insured was "ELDBRIDGE G PADDOCK (DBA) C V C."[14]

The issue then becomes whether the policy provides auto coverage to Paddock in all his business entities or only for Carmel Valley Construction activities.[15] The declarations page contains little useful information. Near the top of the page, the phrase "(2) COMMERCIAL AUTO AGGREGATE HAULERS" has been typed, but there is no indication as to its meaning (or if there is a "(1)" that corresponds to the "(2).") Where there is a space for "BUSINESS DESCRIPTION:" the word "CONSTRUCTION" appears, with an indication that the "FORM OF BUSINESS" is "individual." The "SCHEDULE OF COVERAGE AND

---

[14] The certificate appears to pertain to the previous year's policy, but we consider that immaterial. When Smith attempted to rely on this document in opposition to Financial Pacific's motion for summary judgment, Financial Pacific objected, claiming "The 2013 policy which is [the] policy referred to in the document is not at issue and not in evidence." Curiously, this page was submitted by Financial Pacific in support of its own motion for summary judgment. It was marked as page 35 of Exhibit A, which purported to be "a true and correct copy of the Financial Pacific policy at issue in this suit." In any event, the trial court did not rule on any objections and neither party pursues them on appeal; we therefore consider the document.

[15] We are concerned only with the auto part of the policy. The commercial general liability part of the policy is not at issue.

27

COVERED AUTOS" provides liability coverage for three classes of autos, including symbol "07" which pertains to the autos specifically described in the declarations. Some of these, as we have discussed, were used in the business of Paddock Land & Cattle. The third class of covered autos, symbol "09," applies to non-owned autos "that are used in connection with your business. This includes 'autos' owned by your employees or partners or members of their households but only while used in your business or personal affairs." In addition, a page entitled "BUSINESS AUTO SUPPLEMENTAL DECLARATIONS" appears to set forth the rating basis that supported the premium calculation for non-ownership liability. Under "NAMED INSURED'S BUSINESS" it states, "Other than a Social Service Agency." The rating basis is the number of employees, and the premium is calculated for "0 – 25" employees.[16]

The policy does not specifically define "business," nor does it have an exclusion eliminating from coverage any particular businesses, or an endorsement limiting coverage to construction-related auto liability. There is a clause relating to newly formed businesses, which includes, as an additional insured, "**BROAD FORM NAMED INSURED** [¶] Any business entity newly acquired or formed by you, other than a partnership, joint venture or limited liability company during the policy period provided you own 50 [percent] or more of the business entity and the business entity is not separately insured for Business Auto Coverage. Coverage is extended up to a maximum of 180 days following acquisition or formation of the business entity." While this clause does not appear to apply to Paddock Land & Cattle,

---

[16] The record does not indicate the total number of employees of Carmel Valley Construction and/or Paddock Land & Cattle at the time the policy was written.

which predated this policy, it suggests that coverage was not limited to construction businesses, but instead broadly applied across Paddock's business ventures.

Taken together, we do not find a clear indication that the policy limits auto coverage to Paddock's construction business. While Financial Pacific points to the words "CONSTRUCTION" and "AGGREGATE HAULERS" on the declarations page, Smith counters with the broader "Other than a Social Service Agency" as the named insured's business on the Business Auto Supplemental Declarations page. Neither phrase specifically indicates that it describes the limits of coverage, and they appear to be contradictory to the extent that they do so. Paddock purchased coverage not just for listed vehicles, but also for non-owned autos, which provided coverage to employees or members of their households "while used in your business or personal affairs." That this coverage extended to Paddock's "personal affairs" indicates that coverage was not strictly limited to Carmel Valley Construction operations; that the policy never defined "business," but, instead, provided coverage for new businesses of any type, further implies a lack of limitation. Taken together, we agree with the trial court that Financial Pacific failed to establish the broad coverage presumed by *Providence* was limited by policy terms.

4.    Construing any Ambiguity in Favor of the Reasonable Expectations of the Insured, There is Coverage

To the extent there is an ambiguity in the nature of the business ventures covered, we must construe the ambiguity in favor of the reasonable expectations of the insured, Paddock. Here, the evidence is overwhelming that Paddock reasonably believed the policy provided auto coverage for Paddock Land &

Cattle. When he applied for the policy, he indicated he had no other business ventures he wanted excluded from coverage. (The Travelers policy, as we have explained, had an auto exclusion.) He had vehicles that were used for Paddock Land & Cattle listed in the policy. He identified as drivers to be protected by the policy some people who were employed solely by Paddock Land & Cattle. Finally, when Paddock needed a certificate of insurance to satisfy his auto insurance obligations for the lease of Palo Corona Regional Park held in the name of Paddock Land & Cattle, Financial Pacific supplied one.

Financial Pacific would overlook this evidence because these actions were not taken by Financial Pacific directly, but by Paddock's insurance broker, Neilson & Phillips. Therefore, according to Financial Pacific, all of this evidence relates only to Paddock's subjective intent regarding coverage, which was never communicated to Financial Pacific, and thus could not give rise to a reasonable expectation of coverage.

This argument is not factually supported. Insurance Code section 31 defines an "Insurance agent" as a person authorized, by and on behalf of an insurer, to transact insurance on behalf of the company. In contrast, Insurance Code section 33 defines an "Insurance broker" as a person who, on behalf of another person transacts insurance "with, but not on behalf of, an insurer." These two professions are not separately licensed, but instead licensed under the single title of "broker-agent." (Ins. Code, §§ 33.5, 1625, subd. (a).) An independent broker is not the agent of an insurer with whom it places insurance. (*Marsh & McLennan of Cal., Inc. v. City of Los Angeles* (1976) 62 Cal.App.3d 108, 117.) However, when a broker-agent has been authorized to conduct business on behalf of an insurer, and that authorization is evidenced by a notice of appointment filed with

the Department of Insurance, any presumption that the broker-agent is independent is rebutted. (Ins. Code, § 1623, subd. (c)(1).) In fact, if that authorization is combined with a written agency agreement with the insurer, the broker-agent is conclusively established to be the insurer's agent. (*Loehr v. Great Republic Ins. Co.* (1990) 226 Cal.App.3d 727, 732–733.) Here, Smith submitted a printout from the Department of Insurance indicating that Neilson & Phillips possessed a broker-agent license, and was "authorized to transact business on behalf of" a number of listed insurers, including Financial Pacific. Financial Pacific's assertion that Neilson & Phillips was simply an independent broker is unsupported by the facts. As such, Financial Pacific cannot disregard the evidence that, in Paddock's dealings with Financial Pacific through Neilson & Phillips, he had an objectively reasonable expectation that his auto coverage extended to Paddock Land & Cattle activities.

> B. *Financial Pacific Did Not Defeat Bad Faith*

Financial Pacific sought summary adjudication of the cause of action for bad faith on multiple grounds, including the genuine dispute doctrine. The court granted summary adjudication in its favor on that basis, concluding "Upon review of [Financial Pacific]'s arguments, the Court finds that [Financial Pacific] did not unreasonably and in bad faith withhold payment of Mr. Paddock's claim because there was a genuine dispute as to policy coverage. Therefore, Plaintiff's bad faith claim and request for punitive damages fail."

The argument is based on this principle: "It is now settled law in California that an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad

31

faith even though it might be liable for breach of contract. [Citation.]" (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co., supra*, 90 Cal.App.4th at p. 347 (*Chateau*).) " 'The genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim. A *genuine* dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds.' [Citation.]" (*Ghazarian v. Magellan Health, Inc.* (2020) 53 Cal.App.5th 171, 186.)

The doctrine "has been applied primarily in first-party coverage cases, usually involving disputes over policy language or its application. [Citations.]" (*Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 951.) Occasionally it has been used in third party cases (see, e.g., *Lunsford v. American Guarantee & Liability Ins. Co.* (9th Cir. 1994) 18 F.3d 653, 656.)

California authority does not appear to have resolved whether the genuine dispute doctrine is applicable in third party cases. (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2012) ¶ 12:618, p. 12B-104; see *Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385 [finding it "doubtful" that the doctrine applies to third party bad faith cases based on duty to defend].) But the doctrine cannot apply in a case, such as this, where the insurer's alleged bad faith is not only a failure to defend and indemnify, but also a failure to settle. (*Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 530–531.) As the *Howard* court explained, "In first party cases, where payment is sought for the insured's direct losses, an insurer may raise a reasonable dispute over coverage without being guilty of bad faith. (*Chateau, supra*, 90 Cal.App.4th at p. 347[]) But it has never been held that an insurer in a third party case may rely on a genuine dispute over

coverage to refuse settlement." (*Howard v. American National Fire Ins. Co., supra*, 187 Cal.App.4th at p. 530.)

The reason is found in the difference between the obligations imposed on insurers in first and third party cases. In a first party case, a claim for bad faith denial of policy benefits requires that the insurer acted unreasonably or without proper cause. Where there is a genuine dispute as to coverage, there can be no bad faith liability imposed on the insurer for advancing its side of the dispute. (*Bosetti v. United States Life Ins. Co. in City of New York* (2009) 175 Cal.App.4th 1208, 1237, fn. 20.) In a third party failure to settle case, however, a genuine dispute as to coverage does not absolve the insurer from liability, because the insurer has a duty to accept a reasonable settlement, and runs the risk of excess damages when it refuses a reasonable settlement on an ultimately-mistaken belief there is no coverage. "The implied covenant of good faith and fair dealing imposes a duty on an insurer to accept a reasonable offer to settle a claim against its insured. [Citation.]" (*Archdale v. American Internat. Specialty Lines Ins. Co.* (2007) 154 Cal.App.4th 449, 464.) The only permissible consideration in evaluating the reasonableness of an offer is whether, in light of the victim's injuries and the probable liability of the insured, the ultimate judgment is likely to exceed the amount of the settlement offer. (*Ibid.*) "The existence of a coverage dispute, however meritorious the insurer's position, is simply not a proper consideration in deciding whether to accept an offer to settle the claim against the insured."[17] (*Id.* at pp. 464–465.)

_____

[17] The court continued, "Such a clear rule imposes no unfair burden upon an insurer that may, in all good faith, believe that its policy provides no coverage for the claim. If the insurer rejects a settlement offer on that ground, and its coverage position is

33

Thus, while a genuine dispute as to coverage provides a complete defense to a claim of bad faith in a first party dispute (*Chateau, supra*, 90 Cal.App.4th at p. 347), it does not provide a similar defense to a claim of third party bad faith based on a failure to reasonably settle, because a coverage dispute should not affect a decision as to whether the settlement offer is reasonable. (*Howard v. American National Fire Ins. Co., supra,* 187 Cal.App.4th at pp. 529–531.)

Here, Smith alleged Financial Pacific's failure to reasonably settle as a basis for bad faith. As such, the genuine dispute doctrine did not provide a complete defense to Smith's cause of action for bad faith. On appeal, Financial Pacific offers no alternative basis on which to uphold the summary adjudication in its favor.

C. *The Issue of Damages Must Be Addressed by the Trial Court*

As Smith's cause of action for bad faith is still outstanding, the judgment in his favor and against Financial Pacific must be

---

later vindicated, it will have no liability for the damages flowing from such refusal. In order to mitigate the consequences should its coverage position be ultimately rejected, an insurer may reserve its right to dispute coverage but then go ahead and accept the reasonable settlement offer so as to protect its insured against exposure to an excess judgment. Such action would preclude any claim of bad faith against the insurer in the event coverage was later established; and the insurer would have a remedy in the event that its coverage position was ultimately vindicated. 'If, having reserved such rights and having accepted a reasonable offer, the insurer subsequently establishes the noncoverage of its policy, it would be free to seek reimbursement of the settlement payment from its insured.' [Citation.]" (*Archdale v. American Internat. Specialty Lines Ins. Co., supra*, 154 Cal.App.4th at p. 465, fn. 15.)

reversed as premature. On appeal, Financial Pacific argues that the court did not resolve certain issues that it raised in opposition to Smith's motion for summary adjudication – specifically, that its contract of insurance should be reformed to match the intent of the parties to limit coverage to Carmel Valley Construction and that it was not liable for the entire underlying judgment because the amount of that judgment was excessive due to collusion. Financial Pacific is correct; the *only* issue raised by Smith's motion for summary adjudication was whether the policy provided coverage – it did not address reformation or damages.[18] Reformation and damages remain for resolution.[19]

## *DISPOSITION*

The judgment in favor of Travelers and against Smith is affirmed. Smith shall pay Travelers's costs on appeal.

The judgment in favor of Smith and against Financial Pacific is reversed and the matter remanded for further proceedings. Specifically, the summary adjudication of the issue

---

[18] On appeal, we asked the parties to address, by letter briefs, the issue of whether the court erred by awarding damages in excess of Financial Pacific's policy limits, given the court's finding that Financial Pacific had not committed bad faith. As we conclude the court's resolution of bad faith was incorrect we need not decide the policy limits issue.

[19] We note that there is some suggestion in the appellate record that, after succeeding on his summary adjudication motion, Smith filed a second motion to resolve some of the outstanding issues. The motion is not part of the record on appeal; we know of it only due to references in briefing on a motion to tax costs. On remand the trial court must consider, in light of our opinion, whether and to what extent proceedings related to the second motion impact any future judgment in the case.

of Financial Pacific's duty to indemnify was properly resolved in favor of Smith; all remaining issues raised in Smith's complaint and Financial Pacific's cross-complaint remain for adjudication. Financial Pacific is to pay Smith's costs on appeal.

Smith's motion for sanctions against Financial Pacific is denied.


                                          RUBIN, P. J.

WE CONCUR:



        MOOR, J.



        KIM, J.

36